# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

**FRIENDS OF THE CAPITAL CRESCENT TRAIL**
c/o Jim Roy, Vice President
Montgomery County, P.O. Box 5803
Bethesda, MD 20824,
  a Montgomery County Company; and

**JOHN MACKNIGHT FITZGERALD**
Montgomery County, 4502 Elm Street
Chevy Chase, MD 20815,
  a Montgomery County resident,

**LEONARD SCENSNY**
4312 Willow Lane
Chevy Chase, MD 20815
  a Montgomery County resident,

      Plaintiffs,

   v.

**UNITED STATES ARMY CORPS OF ENGINEERS**
441 G Street, N.W.
Washington, D.C.  20314,

**COL. JOHN T. LITZ**, Commander and District Engineer
United States Army Corps of Engineers
Baltimore District
2 Hopkins Plaza
Baltimore, MD  21201,

**JOSEPH P. DAVIA**, Chief, Maryland Section, Northern
United States Army Corps of Engineers
Regulatory Branch, Baltimore District
2 Hopkins Plaza
Baltimore, MD 21201,

      Defendants.

**COMPLAINT FOR DECLARATORY RELIEF**

Case No. **19-106**
Filed: **1/10/19**

## COMPLAINT FOR DECLARATORY RELIEF

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs, Friends of the Capital Crescent Trail c/o Jim Roy, Vice President, John MacKnight Fitzgerald, and Leonard Scensny by and through undersigned counsel, make a complaint against defendants for declaratory relief, and state as follows:

### NATURE OF THE ACTION

1.      Plaintiffs seek relief from a violation of federal law by defendants in issuing a permit authorizing the Maryland Transit Administration ("MTA") to discharge dredged or fill material into the Waters of the United States at specified locations in connection with construction of a 16.2 mile light-rail transit (LRT) line, known as the Purple Line, from the Bethesda Metro Station in Montgomery County, Maryland to the New Carrollton Station in Prince George's County, Maryland (the Project).      The Permit CENAB-OP-RMN (MTA/PURPLE LINE), Number 2016-61278-M07, (the "Permit"), was issued on March 14, 2018, pursuant to Section 404 of the Clean Water Act, as amended, 33 U.S.C. § 1344.  As detailed below, the Permit was issued in violation of the Clean Water Act ("CWA") because defendants failed to require the MTA to meet its burden to prove with clear and convincing evidence that, for this non-water-dependent Project, an alternative with less adverse impact on the Waters of the United States was impracticable.   Instead, defendants relied upon an Alternatives Analysis supplied by MTA without conducting an adequate and independent review of that analysis, including failing to require MTA to supplement the information it provided defendants with the information defendants needed to conduct a meaningful, independent review of less harmful Project alternatives under CWA standards, in light of the overall purposes of the Project, as determined by defendants. Defendants' actions in violation of the CWA are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the

meaning of §706(2) of the APA.  Accordingly, Plaintiffs seek declaratory relief in this action that the Permit is invalid and an order of vacatur.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3.      Venue is proper is this district under 28 U.S.C. § 1391(e)(1) because defendant United States Army Corps of Engineers ("USACE") is an agency of the federal government, the individual defendants are officers or employees of United States Army Corps of Engineers, sued in their official capacity, and a substantial part of the events or omissions giving rise to the claim occurred in the District of Maryland.  For purposes of Local Rule 501, all plaintiffs are located or reside in the Southern Division of the District of Maryland.

## PARTIES AND STANDING

4.      Plaintiff, Friends of the Capital Crescent Trail, is a 501(c)(3) non-profit organization dedicated to preserving parkland, open space, and quality of life in Montgomery County, Maryland.  Friends of the Capital Crescent Trail is an environmentally conscious group that advocates for transportation solutions that do not sacrifice invaluable regional resources such as the Capital Crescent Trail ("CCT").  This case is brought on behalf of Friends of the Capital Crescent Trail and its Board members and supporters (hereinafter, collectively "FCCT").  FCCT use and enjoy the CCT on a regular basis.

5.      As approved under the Permit, the Project will injure the interests of FCCT in preserving and restoring the ecological integrity and tranquil, natural character of the CCT, and will significantly change the nature of the CCT, adversely impacting the FCCT's experience on it and causing its members aesthetic injury.

6.      Plaintiff John Fitzgerald is a semi-retired public interest attorney and consultant. His current work focuses on environmental conservation.  Mr. Fitzgerald has lived in Chevy Chase, Maryland since 1999, in property confronting the CCT, during which time he has been and continues to be a frequent user of what remains open of the CCT.  Mr. Fitzgerald also enjoys biking and walking in Rock Creek Park, and occasional canoeing on the Potomac and Anacostia Rivers.  Mr. Fitzgerald has a strong professional, recreational and aesthetic interest in both the use and preservation of the CCT and Rock Creek Park.

7.      Plaintiff, Leonard Scensny, is a resident of Montgomery County, and lives in Chevy Chase. During the past 30 years, Mr. Scensny has been a regular user of Rock Creek Park and the CCT as a bicyclist and pedestrian.  Mr. Scensny has a deep appreciation of these resources for recreation, social interaction and preservation of biodiversity.  He has been active in efforts to limit the impact of the Purple Line project and he testified at a USACE hearing, expressing concern about the impact of the Project on Rock Creek, other streams, and the Chesapeake Bay watershed.

8.      Plaintiffs Fitzgerald and Scensny would be injured by the degradation of the CCT and Rock Creek Park caused by the issuance of the Permit if the Permit is not vacated.

9.      As approved under the Permit, the Project will injure plaintiffs Fitzgerald and Scensny's practical, professional, aesthetic and recreational interests in the CCT and Rock Creek Park.

10.      Plaintiffs have participated extensively in the public process of federal agency decisions concerning the Project, including submitting timely comments to defendant USACE expressing opposition to the MTA-requested Permit on grounds, *inter alia*, that there exist

practicable alternatives to the Project less damaging to the Waters of the United States that were not addressed by MTA in applying for the Permit nor considered by USACE in granting it.

11.     Declaratory relief invalidating and vacating the Permit will redress plaintiffs' injuries because, absent the Permit, MTA will be obliged to employ practicable alternatives to the Project's current configuration that will either eliminate or significantly reduce injury to segments of the CCT and adjacent areas, as well as the discharge of pollutants into the Waters of the United States in Rock Creek Park and elsewhere.

12.     Defendant United States Army Corps of Engineers ("USACE") is an agency of the United States with jurisdiction over the Waters of the United States as defined in the CWA.

13.     Defendant Col. John T. Litz is the Commander and District Engineer of the Baltimore District of USACE. Defendant Litz is sued in his official capacity.

14.     Defendant Joseph P. DaVia is Chief of the Maryland Section, Northern, Regulatory Branch of the Baltimore District. He is the official within USACE who issued the Permit to MTA, doing so on behalf of Col. Edward P. Chamberlayne, Commander and District Engineer of the Baltimore District of USACE, the predecessor to defendant Litz.

## STATUTORY AND REGULATORY FRAMEWORK

15.     The CWA established a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants into the Waters of the United States unless it is authorized by a CWA permit. *Id.* at § 1311 (a).

16.     Section 404 of the CWA authorizes the Secretary of the Army, through USACE, to regulate the discharges of dredged and fill material into jurisdictional "Waters of the United States" through permits. 33 U.S.C. § 1344. USACE issues such permits under the guidance and

requirements imposed by USACE regulations, 33 C.F.R. §§ 320.1 *et seq.*, as well as the CWA Guidelines ("Guidelines"), 40 C.F.R. § 230.1 *et seq.*, developed by the Environmental Protection Administration ("EPA") in conjunction with USACE.

17.    The Guidelines specify that USACE must ensure that the proposed fill material will not cause any significantly adverse effects on human health or welfare; aquatic life, and aquatic ecosystems; or recreational, aesthetic or economic values. 40 C.F.R. § 230.10 (c)(1)-(4).

18.    The Guidelines generally prohibit issuing permits for projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant environmental consequences." 40 C.F.R. § 230.10 (a); 33 C.F.R. § 320.4(a)(2)(ii). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10 (a)(2).

19.    In applying this standard, USACE is required to follow a two-step procedure. First, an accurate statement of the project's "basic purpose" is necessary, which USACE defines. *See* 40 C.F.R. § 230.10 (a)(3). Second, USACE must determine whether the basic purpose is "water dependent." *Id.* If the purpose is not water dependent, the availability of practicable alternatives is presumed under 40 C.F.R. § 230.10(a)(3).

20.    The preamble to the Guidelines state that in the case of such non-water dependent activities, "it is reasonable to assume there will generally be a practicable [alternative] in a less vulnerable part of the ecosystem." 45 Fed. Reg. 85339. When this presumption applies, the permit applicant must rebut the presumption by clearly demonstrating that a practicable alternative is not available. 40 C.F.R. § 230.10(a)(3).

21.     Unless the permit applicant demonstrates otherwise, USACE must presume that all practicable alternatives that do not involve the discharge of pollutants into a wetland have a less adverse environmental impact. *Id.* Where the presumption applies, the permit applicant bears the burden by providing detailed, clear and convincing information proving that an alternative with less adverse impact is impracticable. USACE may rely on information submitted by the applicant but must independently verify such information. 40 C.F.R. § 1506.5(a) ("The agency shall independently evaluate the information submitted and shall be responsible for its accuracy.").

22.     Under Executive Branch directives from the Council on Environmental Quality ("CEQ"), National Environmental Policy Act ("NEPA") lead agencies have been strongly encouraged to coordinate or merge the environmental analysis required for a project under NEPA, 42 U.S.C. § 4321 *et seq.*, with other environmental analyses required by law for the project, so that the cooperating agencies are able to participate fully from the outset in the vetting of project alternatives. Such merger or coordination is expressly contemplated for CWA permits under 33 C.F.R. Part 325, Appendix B, ¶8.c. (Corps as Cooperating Agency) and 40 C.F.R. §§1501.6(b), 1508.5. When there is such merger or coordination, USACE may adopt another federal agency's NEPA-based final environmental impact statement ("FEIS") after an independent review of it, unless there is substantial doubt as to any technical or procedural inaccuracies or an omission of considerations bearing on the CWA decision USACE must make. 33 C.F.R. § 230.21; 40 C.F.R. §§ 1506.3, 1506.5.

23.     Where USACE is not a cooperating agency or the lead agency FEIS, the USACE independent review of practicable alternatives under the Guidelines may include, as part of that review, review of any alternatives analysis in the FEIS, but the review is to be supplemented

with any additional information needed to consider the alternatives in sufficient detail to respond to the requirements in the Guidelines, 40 C.F.R. §§ 230.10(a)(4) & (5), which are materially different. Alternatives may be rejected by USACE as impractical only if USACE rebuts the presumption that there are practicable alternatives with less adverse environmental impact, following a critical evaluation of the alternatives.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIM FOR RELIEF

### Background

24.     The Project is a major transportation infrastructure project that is not a part of, nor administered by, the Washington Metropolitan Area Transit Authority (WMATA).     It is a project of the MTA, Montgomery County, and Prince George's County, with substantial funding from the U.S. Department of Transportation ("DOT"), Federal Transit Administration (FTA). A private consortium was selected to design, build, and operate the Project. The Project consists of a 16.2-mile east-west, above-ground double track rail system traversing parks, streams, forested areas and other open spaces between the Bethesda Metrorail station in Montgomery County and the New Carrollton Metrorail/MARC/Amtrak station in Prince George's County.  It includes a concrete, walled replacement bicycle and hiking trail with a limited number of entrances and no canopy or shade trees overhead to replace the previously shaded cinder-covered path between Bethesda and Silver Spring.  The Project includes two sets of train tracks, their overhead power lines and adjacent power stations and almost a mile of new culverts, as well as the replacement trail, for a combined width, varying from 66 to 100 feet covering and extending many yards beyond what was an average of 12 - 16 feet.   The Project will divert water from the area, and traverse parks, streams, forested areas and other open spaces, and in particular, would impact Rock Creek National and regional Parks where it would cross Rock Creek in Montgomery

County. The Waters of the United States that it will cross also include Sligo Creek, Long Branch Creek, Northwest Branch Creek and Northeast Branch Creek, which are all tributaries of the Anacostia River.

25.    Between 2003 and 2008, the FTA and MTA jointly prepared a draft EIS ("DEIS) under NEPA. The DEIS was released for public comment in October 2008. Also published along with the DEIS was an Alternatives Analysis ("AA"). Combined, the AA/DEIS discussed eight Project design alternatives. Six were "build" alternatives, contemplating new construction of a light-rail or bus rapid transit (BRT) system at varying investment levels. The seventh was a "transportation systems management" ("TSM") alternative, in which there would be no new construction but instead various improvements would be made to existing systems. The eighth was the "no build" alternative. The AA/DEIS compared these alternatives on various grounds, including environmental impact. During the public comment period on the AA/DEIS, the Town of Chevy Chase and the Columbia Country Club filed extensive comments with the assistance of expert consultants and challenged the accuracy and reliability of the AA/DEIS and identified practicable and less environmentally damaging alternatives to the "build" alternatives considered in the AA/DEIS. Plaintiffs incorporated these critiques by name in their written comments on the permit application.

26.    After the close of the DEIS comment period, MTA publicly identified in August 2009 a modified version of the medium-investment LRT alternative discussed in the AA/DEIS as the "locally preferred option." After further study and public involvement the FEIS was issued in August 2013. The only alternative to the locally preferred option to which it was compared was the "no build" option. Plaintiffs and other commenters including the Town of Chevy Chase and their experts expressed similar concerns in comments on the FEIS. As noted

by plaintiffs in their comments on the Permit application, all of these are readily available in the Administrative Record for the Project's AA/DEIS and FEIS.

27.    The FEIS sets forth the Project's three purposes:

> (1)    Provide faster, more direct, and more reliable east-west transit service connecting the major activities in the Purple Line corridor at Bethesda, Silver Spring, Takoma/Langley Park, College Park, and New Carrollton;
>
> (2)    Provide better connections to Metrorail services located in the corridor; and
>
> (3)    Improve connectivity to the communities in the corridor located between the Metrorail lines.

FEIS, Ch. 1 at 1 (Aug. 28, 2013).

28.    Based on the FEIS and AA/DEIS, and their supporting technical and other design documents, FTA issued the Project's Record of Decision (ROD) in March 2014, certifying NEPA compliance.

## USACE Assessment of the Project Under the CWA and the Guidelines

29.    Defendants' environmental assessment, statement of findings and Guidelines evaluation of the Project for purposes of acting on the Permit application is set forth in a March 12, 2018 "Memorandum for Record," signed by USACE staff member Maria N. Teresi and defendant DaVia. (Record Memo).

30.    During the period of FTA/MTA development of the AA/DEIS and FEIS, USACE was not a cooperating agency on its development.  USACE staff did attend an MTA scoping meeting early in the process, i.e., on September 23, 2003 and mitigation meetings/field reviews in May, October and November 2012, and one-day field visits in July 2013 and June 2017, for identification of impacted waters.  Through these interactions and other unspecified interagency

meetings and conference calls, defendants were able to make a jurisdictional determination on February 24, 2014 that the Project may impact Waters of the United States. Record Memo at 12, 16.

31.     The Record Memo discusses the purpose and need for the Project at page 14. After noting the Project's purposes as set forth in the FEIS (quoted above), the Record Memo concluded that, as determined by the Corps, the "basic project purpose" is "mass transit service." *Id.*

32.     The Record Memo then concludes that the Project is **not** "water dependent," because "[t]he activity does not require access or proximity to or siting within a special aquatic site to fulfill its basic purpose." *Id.*

33.     The Record Memo next states the "Overall project purpose, as determined by the Corps" to be as follows:

> To provide an expedited east-west mass transit service connecting major activity centers in a corridor extending from Bethesda to New Carrollton; to provide improved connections and travel times to the Metrorail services located in the corridor; and to improve connectivity to the communities in the corridor located between the Metrorail lines.

*Id.*

34.     In this action, plaintiffs do not disagree with the defendants' determination of (a) the basic project purpose; (b) the non-water dependency of the project; or (c) the overall project purpose, all as set forth in the Record Memo.

35.     Defendants established a public comment period on the Permit application that ran from September 13, 2016 through December 2, 2016. Defendants held two public meetings

on the Permit application, one in Silver Spring, Maryland on October 17, 2016 and the other in Hyattsville, Maryland on October 18, 2016. *Id.* at 15.

36.     Plaintiffs submitted written comments in opposition to the Permit during the comment period. These comments included the claim that it was a matter of record that there were practicable and less environmentally damaging alternatives available for the Project. Plaintiff Fitzgerald attended the Silver Spring meeting and testified in opposition to the grant of the Permit.

37.     According to the Record Memo, defendants forwarded comments received during the comment period to MTA, requesting additional information. There is no indication in the Record Memo that MTA responded to the submitted comments or to defendants' request for additional information. Record Memo at 14-16.

38.     Defendants' analysis of MTA's compliance with the CWA and the Guidelines is set forth in paragraphs 5 and 6 of the Record Memo, at 17-33. The Record Memo begins with an acknowledgement that an evaluation of alternatives is required in this case, due to the anticipated discharge of dredged or fill material into the Waters of the United States, and that "no alternative may be permitted if there is a less environmentally damaging practicable alternative." *Id.* at 17. Defendants further state that "In order to be practicable, an alternative must be available, achieve the project purpose (as defined by the Corps), and be feasible when considering cost, logistics and existing technology." *Id.*

39.     As detailed in the Record Memo, the alternatives analysis conducted by defendants consisted primarily of a brief review of the AA/DEIS Definition of Alternatives Technical Report (MTA Technical Report). *Id.* at 17-22. The Record Memo identifies each of the eight alternatives discussed in the MTA Technical Report to determine if it is a practicable

alternative in light of the overall project purposes. In each case other than the alternative chosen by MTA, defendants concluded that the alternative was either (a) "not a practicable alternative in light of the overall project purposes" or (b) "not the least damaging practicable alternative in light of the overall project purposes." *Id.* at 17-21.

40.     The Record Memo also briefly notes that seventeen additional alternatives were identified in the MTA Technical Report and that MTA dropped them "from further study for a variety of reasons." *Id.* at 21. The Record Memo discloses no information or analysis of any of these options in relation to the criteria for evaluating practicable alternatives under the CWA and the Guidelines.

41.     The Record Memo also briefly notes that FTA and MTA had concluded in a later analysis "that the basis for selecting light rail over BRT or other alternatives remains valid." *Id.* The Record Memo explains that this analysis was submitted by MTA to and concurred in by FTA in December 2016, and that the MTA concluded that a decline in Metrorail ridership "would not significantly affect the purpose and need, the alternatives analysis, or the environmental effects for the project, as set forth in the FEIS." *Id.* at 16. The analysis is described under section 4.3 of the Record Memo, the section labeled for discussion of comments received that "address activities and/or comments outside of the Corps' purview." *Id.* The Record Memo neither discloses nor analyzes any information in this newer MTA/FTA analysis bearing upon the criteria for evaluating practicable alternatives under the CWA and the Guidelines.

42.     The Record Memo then concludes that the Medium Investment LRT alternative preferred by MTA is the "[l]east environmentally damaging alternative under the 404(b)(1) Guidelines." *Id.* at 21. The Record Memo notes that while this option "has higher stream

impacts than certain other build alternatives," *id.*, it "has significantly lower wetland impacts than all other build options." *Id.* The Record Memo finds that this option, approved by the Permit, will "permanently impact 0.49 acres of wetlands and 5,108 linear feet of streams." *Id.*

**A Less Environmentally Damaging Practicable Alternative**

43. Insofar as plaintiffs have been able to determine following their examination of publicly available information and information received in response to a Freedom of Information Act request made to USACE after Permit issuance, and as detailed above, (a) MTA relied exclusively on information in the AA/DEIS and its associated Technical Reports to demonstrate compliance with the CWA and Guidelines regarding whether there were practicable alternatives to the locally preferred option described in the FEIS, and (b) defendants did not require MTA to submit additional information regarding the existence of such practicable alternatives.

44. As detailed above, under the Guidelines, when defendants review a permit application for a non-water dependent activity, they must employ a presumption that there is a practicable alternative to the requested discharge into the Waters of the United States, making it incumbent on the applicant to rebut the presumption by clearly demonstrating that a practicable alternative is not available. When, as here, the impact of the project involves discharge into wetlands, the burden on the applicant is even more pronounced: the applicant must provide detailed, clear and convincing evidence proving that an alternative with less adverse impact is impractical. In addition, defendants cannot simply accept the applicant's representations; they must independently evaluate the information submitted and be responsible for its accuracy.

45. In this instance, MTA/FTA could have ensured that defendants were provided the information needed for proper CWA permit review by doing what agencies that must comply with NEPA are strongly encouraged to do: make USACE a cooperating agency in the EIS

process. MTA/FTA failed to do so, and USACE did not insist on being such in this instance. The resulting AA/DEIS and FEIS do not directly address the CWA/Guidelines standards and requirements, which require USACE to evaluate alternatives to the locally preferred option under different substantive criteria than the criteria under which alternatives are generally evaluated under NEPA.

46.    Under these circumstances, while defendants could review the alternatives analysis developed under NEPA by an applicant, its "review is to be supplemented with any additional information needed to consider the alternatives in sufficient detail to respond to the requirements in the Guidelines."   40 C.F.R.  §§ 230.10(a)(4)  &  (5).   Thus, to rebut the presumption of the existence of a practicable alternative, defendants must be satisfied from detailed, clear and convincing information supplied by, or demanded from, the applicant that there is no such practicable alternative available. The CWA and Guidelines standards cannot be met merely by evaluating the alternatives considered in the NEPA process; if there is a less environmentally damaging practicable alternative to the preferred alternative, the Permit for the preferred alternative must be rejected, regardless of whether that less damaging practicable alternative was considered in the NEPA process.

47.    In this instance, defendants' analysis of the Permit application for practicable alternatives consisted simply of reviewing the AA/DEIS alternatives and selecting from among the six "build" options the one that was deemed by MTA to be the least environmentally damaging among those options. Record Memo at 21-22.

48.    This methodology was plainly deficient under the CWA/Guidelines, because MTA was not tasked with rebutting the presumption that a practicable alternative with less environmental impact of the Waters of the United States exists.   The relatively narrow set of

alternatives considered by MTA in the NEPA process cannot begin to support the inference that

a broad spectrum of practicable alternatives had been considered, much less constitute the

requisite detailed, clear and convincing information that there is no practicable alternative to the

one advanced by MTA.

49.     While it is not plaintiffs' obligation to demonstrate that MTA cannot meet its

burden of rebutting the presumption that should have been but was not employed, the

documentation supplied by MTA and relied upon by defendants amply supports the very likely

existence of a much less environmentally damaging practicable alternative.

50.     Specifically, the Technical Report (at 1-9 to 1-10) identifies three types of

guideway for both the BRT and LRT modes of operation, as follows:

- Shared-use lanes– When transit vehicles travel in mixed traffic, they are subject to the same speed restrictions and congestion as general traffic. Current bus service in the corridor makes use of shared-use lanes, as does the No Build. Where there is little congestion, limited right-of-way, or high monetary or environmental costs, shared-use lanes can be the best option.

- Dedicated Surface Lanes– There are number of ways to dedicate surface lanes on existing roads for transit use. Depending on available right-of-way, traffic volumes, parking needs, and alternative design, transit vehicles would travel either in the curb lane or the median of a roadway. General traffic would be able to cross dedicated lanes.

- Exclusive Guideway (tunnels, transit-only lanes, and elevated segments) – Where BRT or LRT vehicles travel in tunnels, elevated segments, or along new alignment, the guideway would be for the exclusive use of transit vehicles. General traffic would not be permitted access to these guideways.

51.     The Technical Report (Table 2-11 at 2-15) makes clear that whether the Purple

Line is a BRT or an LRT project, and regardless of the level of investment in exclusive guideway

lanes, it will employ a mix of the three guideway options, as necessary and appropriate at a given

location, resulting in differing amounts of mileage for each guideway option for the six build alternatives.   Elsewhere in the AA/DEIS, various guideway configurations are shown, making clear that the width of the right-of-way varies according to the guideway configuration selected in any given location.  AA/DEIS at 2-14, 2-16, 2-20, 2-22, and 2-24.

52.    Further, the AA/DEIS (at 4-69) makes clear that the adverse impact on wetlands is tied directly to the right-of-way width selected at the stream crossings:

> Most of the wetlands identified along the alignments fall outside
> the limits of disturbance for the project. Impacts that do occur are
> primarily related to streams that cross perpendicular to the project
> or parallel the roadway and would be affected when existing roads
> are widened to accommodate the transitway.

53.    Finally, the Record Memo makes clear that if the existing bridges that cross the streams are not "widened to accommodate the transitway," there will be no adverse environmental impact on the Waters of the United States. It states that because the TSM alternative does not involve the construction of a new transit guideway, it "would not have any impacts to waters of the U.S." Record Memo 19.

54.    Based upon these obviously relevant and readily apparent facts in the record before defendants, it is self-evident that a BRT system with a transit guideway for most of the Project route that eschews or avoids the widening of bridges along the route would have less adverse environmental impact than the medium investment LRT option chosen.

55.    Had this readily apparent, less environmentally damaging alternative not been overlooked or ignored, it would leave for resolution by defendants only the question of whether this option would be practicable in light of the overall project purposes.  Those purposes, as found by USACE, dealt exclusively with expediting mass transit service in the Bethesda-New Carrollton corridor; improved connections and travel times to Metrorail in the corridor; and

improved connectivity to the community between the Metrorail lines. Record Memo 14. The alternatives analysis in the Record Memo does not fault the BRT alternatives in comparison to the selected LRT alternative on any of these criteria except travel time.

56.     The Record Memo states that "light rail is faster than BRT by 9 to 14 minutes for an end-to-end trip and provides 20 to 27% reduction in ridership travel time." *Id.* at 19. The source of these data is not clearly explained, but the AA/DEIS contains two tables comparing travel times among the alternatives presented there, which show no difference in the end-to-end travel time for high investment BRT as compared to medium investment LRT (59 minutes). Table 2-9, Technical Report at 2-13. In addition, Table 2-10 breaks down these totals into station-to-station travel times, and comes up with a one-minute difference -- 59 for the LRT, 60 for the BRT (High). It also reports 73 minutes for the BRT (Medium) alternative. When these totals are measured against the current condition of 108 minutes of end-to-end travel time, *id.*, the LRT choice is a 45% improvement, the BRT (High) is a 44% improvement, and the BRT (Medium) is a 32% improvement.

57.     To complete the missing less environmentally damaging alternative analysis, an adjustment would be needed, estimating the additional time it might take to traverse unwidened bridges, all of which are outside the more congested areas of the transitway. Such an adjustment is unlikely to be more than a few minutes for an end-to-end trip. As applied to the BRT (High) alternative, the end-to-end travel time would almost certainly still be an improvement in end-to-end travel of at least 40% over current conditions, a reduction that would be about 90% of the improvement projected for the medium investment LRT alternative.

## VIOLATION OF THE CLEAN WATER ACT AND THE APA

**58.** Plaintiffs incorporate in this Count, as if stated herein in full, the allegations set forth in paragraphs 1 – 57 of this complaint.

**59.** The unaddressed BRT option described above, or some variation on it, in which bridges over the Waters of the United States are not disturbed, or are otherwise minimally affected, is not described or considered in defendants' Record of Decision, because it contains no evidence demonstrating that something slightly less than a 45% reduction in end-to-end travel time would not be a practicable alternative in light of the project purpose of providing "an expedited east-west transit service." This absence is directly attributable to defendants' failure to (a) demand that MTA demonstrate that this key project purpose, along with the other project purposes, could not be achieved by some different mix of guideway and transit choices that reduced or eliminated environmental damage to the Waters of the United States or (b) make its own independent determination that there is no less environmentally damaging practicable alternative to the one advanced by MTA. As a result, there is no finding by defendants that making alternative guideway and transit choices, and hence, right-of-way-width choices, with sensitivity to reducing or eliminating the adverse environmental impacts to the Waters of the United States, was (or was not) an alternative "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R, § 230.10(a)(2).

**60.** Accordingly, defendants' actions and omissions in the course of consideration and approval of the Permit were unlawful under section 404 of the CWA, 33 U.S.C. § 1344.

**61.**     Defendants have abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2), for one or more of the following reasons:

      **a.**     Defendants have entirely failed to consider an important aspect of their obligation to evaluate less environmentally damaging practicable alternatives under the 404(b)(1) Guidelines;

      **b.**     Defendants have offered an explanation for issuance of the Permit that runs counter to the evidence before them in this case; and

      **c.**     Defendants' determination of the least environmentally damaging practicable alternative under the 404(b)(1) Guidelines is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

## ATTORNEY'S FEES

**62.**     Plaintiffs seek an award of attorneys' fees and costs upon substantially prevailing in this action.

**63.**     Plaintiffs seek such fee award under 33 U.S.C. § 1365(d), in that (a) USACE had a mandatory duty to ascertain the facts and correctly apply the law to the facts; (b) USACE failed in this duty; and (c) the Administrator, EPA, is ultimately responsible for the protection of wetlands under 33 U.S.C. §1344(c), and failed to correct USACE's failure to do so, as alleged in this complaint.

**64.**     Alternatively, plaintiffs seek a fee award under the Equal Access to Justice Act, 28 U.S.C. §2412(d).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court:

1.      Declare that Defendants have violated Section 404 of the CWA, 33 U.S.C. § 1344, and Section 706(2) of the APA, 5 U.S.C. §§ 706(2);

2.      Declare that the Permit is invalid and of no force and effect with respect to the Project for which the Permit was applied for by MTA;

3.      Issue an order vacating the Permit;

4.      Award Plaintiffs their reasonable attorneys' and other litigation costs in this action under §1365(d) of the CWA or under the Equal Access to Justice Act, 28 U.S.C. §2412(d); and

5.      Grant Plaintiffs such other and further relief that the Court may deem is just and proper.

Respectfully submitted,

**KNOPF & BROWN**

David W. Brown, Bar No. 12941
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100
**Attorneys for Plaintiffs**

January 10, 2019