# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Friends of Capital Crescent Trail,** *et al.* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Case No. **8:19-cv-00106-PJM** |
| | : | |
| **U.S. Army Corps of Engineers,** *et al.* | : | |
| | : | |
| Defendants, | : | |
| | : | |
| **Maryland Department of Transportation** and | : | |
| **Maryland Transit Administration** | : | |
| | : | |
| Defendant Intervenors. | : | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

David W. Brown
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100
**Attorneys for Plaintiffs**

September 19, 2019

# TABLE OF CONTENTS

I.    **INTRODUCTION**      1

II.    **STATUTORY AND REGULATORY FRAMEWORK**      2

III.    **RELEVANT RECORD FACTS**      4

     **A.** Background      4

     **B.** USACE Assessment of the Project Under the CWA and the Guidelines      7

     **C.** The Missing Less Environmentally Damaging Practicable Alternative      12

IV.    **STANDARD OF REVIEW**      16

     **A.** Administrative Procedure Act (APA) Standards      16

     **B.** Summary Judgment Standards      17

V.    **THE PERMIT WAS ISSUED IN VIOLATION OF THE CWA**      17

     **A.** Under CWA Standards, Defendants had to Rebut the Presumption That No Less Damaging Practicable Alternative Using BRT Would Fulfill the Overall Project Purpose      17

     **B.** Defendants Failed to Rebut the LEDPA Presumption      18

         1.    Defendants Accepted MTA's Exclusive Reliance on Its NEPA-Based Alternatives Analysis      18

         2.    Defendants Made Legally Insufficient LEDPA Findings When They Improperly Allowed MTA to Categorically Rule Out All BRT Options      20

         3.    The Record Does Not In Any Way Rebut the LEDPA Presumption As Applied to Possible BRT Alternatives      21

VI.    **CONCLUSION**      26

Addendum of Pertinent Statutes and Regulations      AP1-28

## I. INTRODUCTION

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitzgerald, and Leonard Scensny by and through undersigned counsel, submit this memorandum in support of their motion for summary judgment in this action. Plaintiffs seek relief from a violation of federal law by defendants in issuing a permit authorizing the Maryland Transit Administration ("MTA") to discharge dredged or fill material into the Waters of the United States at specified locations in connection with construction of a 16.2 mile light-rail transit (LRT) line, known as the Purple Line, from the Bethesda Metro Station in Montgomery County, Maryland to the New Carrollton Station in Prince George's County, Maryland (the "Project"). The Permit CENAB-OP-RMN (MTA/PURPLE LINE), Number 2016-61278-M07, (the "Permit"), was issued on March 14, 2018, pursuant to Section 404 of the Clean Water Act, as amended, 33 U.S.C. § 1344. AR0277105-123; AR0277147-148,[1]

The Permit was issued in violation of the Clean Water Act ("CWA") because defendants failed to require the MTA to meet its burden to prove with clear and convincing evidence that, for this non-water-dependent Project, an alternative with less adverse impact on the Waters of the United States was impracticable. Instead, defendants relied upon a legally insufficient Alternatives Analysis supplied by MTA without conducting an adequate and independent review of that analysis, including failing to require MTA to supplement the information it provided defendants with the information defendants needed to conduct a meaningful, independent review of less

---

[1] Citations to the Section 404 Administrative Record submitted by defendants in this case are in the form "AR," followed by the seven-digit pagination reference shown on each page. For brevity's sake, plaintiffs' record citations herein generally do not include descriptions of the cited documents. Those can be found in the index to the Plaintiffs' AR Appendix filed contemporaneously with the motion.

harmful Project alternatives under CWA standards, in light of the overall purposes of the Project, as determined by defendants. Defendants' actions in violation of the CWA are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, within the meaning of §706(2)(A) of the APA. Based on the facts of record before defendants, there is no dispute of material fact and plaintiffs are entitled to judgment as a matter of law, to declaratory relief that the Permit is invalid, and to an order of vacatur.

## II.    STATUTORY AND REGULATORY FRAMEWORK

The CWA established a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).[2] To achieve this goal, the CWA prohibits the discharge of pollutants into the Waters of the United States unless authorized by a CWA permit. 33 U.S.C. §1311 (a). Section 404 of the CWA authorizes the Secretary of the Army, through the United States Army Corps of Engineers ("USACE"), to regulate the discharges of dredged and fill material into jurisdictional "Waters of the United States" through permits. 33 U.S.C. § 1344. USACE issues such permits under the guidance and requirements imposed by USACE regulations, 33 C.F.R. §§ 320.1 *et seq.*, as well as the CWA Guidelines ("Guidelines"), 40 C.F.R. § 230, developed by the Environmental Protection Administration ("EPA") in conjunction with USACE.

The Guidelines specify that USACE must ensure that proposed fill material will not cause any significantly adverse effects on human health or welfare; on aquatic life and aquatic ecosystems; or on recreational, aesthetic or economic values. 40 C.F.R. § 230.10 (c)(1)-(4). The

---

[2] Copies of statutory and regulatory provisions cited herein are included in a statutory addendum to this memorandum.

Guidelines prohibit issuing permits for non-water-dependent projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant environmental consequences." 40 C.F.R. § 230.10(a); 33 C.F.R. § 320.4(a)(2)(ii). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10 (a)(2).

In applying this standard, USACE first defines the project's "basic purpose". *See* 40 C.F.R. § 230.10(a)(3). USACE must then determine whether the basic purpose is "water dependent." *Id.* If the purpose is not water dependent, the availability of practicable alternatives is presumed unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3). The preamble to the Guidelines state that in the case of non-water dependent activities, "it is reasonable to assume there will generally be a practicable [alternative] in a less vulnerable part of the aquatic ecosystem." 45 Fed. Reg. 85339. Where the reasonable alternative presumption applies, the permit applicant bears the burden of providing USACE detailed, clear and convincing information proving that an alternative with less adverse impact is impracticable. USACE may rely on information submitted by the applicant, but must independently verify such information. 40 C.F.R. § 1506.5(a) ("The agency shall independently evaluate the information submitted and shall be responsible for its accuracy.").

Under Executive Branch directives from the Council on Environmental Quality ("CEQ") for implementing the National Environmental Policy Act ("NEPA"), lead agencies have been strongly encouraged to coordinate or merge the environmental analysis required for a project under NEPA, 42 U.S.C. § 4321 *et seq.*, with other environmental analyses required by law for the project, so that the cooperating agencies are able to participate fully from the outset in the vetting of project

alternatives. Such merger or coordination is expressly contemplated for CWA permits under 33 C.F.R. Part 325, Appendix B, ¶8.c. (Corps as Cooperating Agency) and 40 C.F.R. §§1501.6, 1508.5. When there is such merger or coordination, USACE may adopt another federal agency's NEPA-based final environmental impact statement ("FEIS") after an independent review of it, unless there is substantial doubt as to any technical or procedural inaccuracies or an omission of considerations bearing on the CWA decision USACE must make. 40 C.F.R. §§ 1506.3, 1506.5.

Where USACE is not a cooperating agency or the lead agency on the FEIS, the USACE independent review of practicable alternatives under the Guidelines may include, as part of that review, review of any alternatives analysis in the FEIS, but the review is to be supplemented with any additional information needed to consider the alternatives in sufficient detail to respond to the requirements in the Guidelines, 40 C.F.R. §§ 230.10(a)(4) & (5), which are materially different. Alternatives may be rejected by USACE as impractical only if USACE rebuts the presumption that there are practicable alternatives with less adverse environmental impact, following a critical evaluation of the alternatives.

## III. RELEVANT RECORD FACTS

### A. <u>Background</u>

The Project is a major transportation infrastructure project that is not a part of, nor administered by, the Washington Metropolitan Area Transit Authority ("WMATA").[3]  It is a project of the MTA, Montgomery County, and Prince George's County, with substantial funding from the U.S. Department of Transportation ("DOT"), Federal Transit Administration ("FTA").

---

[3] In discussing the facts of record, plaintiffs have, in some instances of undisputed facts, not provided AR citations, relying instead on allegations in the complaint admitted in defendants' answer.

A private consortium was selected to design, build, and operate the Project. The Project consists of a 16.2-mile east-west, above-ground double track rail system traversing parks, streams, forested areas and other open spaces between the Bethesda Metrorail station in Montgomery County and the New Carrollton Metrorail/MARC/Amtrak station in Prince George's County. AR0275464. The Project will divert water from the area, and traverse parks, streams, forested areas and other open spaces, and in particular, would impact Rock Creek National and regional Parks where it would cross Rock Creek in Montgomery County. The Waters of the United States that the Project will cross include Rock Creek, Sligo Creek, Long Branch Creek, Northwest Branch Creek and Northeast Branch Creek, all of which except Rock Creek are tributaries of the Anacostia River. AR0275513-14; AR0275464; AR0277167.

Between 2003 and 2008, the FTA and MTA jointly prepared a draft EIS ("DEIS") under NEPA for the Project. AR0275464. The DEIS was released for public comment in October 2008, inclusive of an Alternatives Analysis ("AA"). *Id.* Combined, the AA/DEIS discussed eight Project design alternatives. AR0277178. Six were "build" alternatives, each contemplating new construction of a light-rail transit (LRT) or bus rapid transit (BRT) system at varying investment levels. The seventh was a "transportation systems management" ("TSM") alternative, in which there would be no new construction but instead various improvements would be made to existing systems. The eighth was the standard "no build" alternative. AR0275466-67. The AA/DEIS compared these alternatives on various grounds, including environmental impact. *Id.*; AR0268382-432. During the public comment period on the AA/DEIS, the Town of Chevy Chase and the Columbia Country Club filed extensive comments with the assistance of expert consultants. They challenged the accuracy and reliability of the AA/DEIS, with particular focus

on assessment of alternatives. Their comments explained that if the exaggerated ridership projections for the LRT alternatives and the artificial disadvantages portrayed for the BRT alternatives were corrected to conform with industry norms and real experience, the analysis would reveal practicable and less environmentally damaging alternatives to the "build" alternatives considered in the AA/DEIS. Plaintiffs later incorporated these critiques by name in their written comments on the Permit application. AR0278822-23.

After the close of the DEIS comment period, in August 2009, MTA publicly identified a modified version of the medium-investment LRT alternative discussed in the AA/DEIS as the "locally preferred option." AR0275467. After further study and public involvement, the FEIS was issued in August 2013. AR0277178; AR0275464. The only alternative to the locally preferred option to which it was compared was the "no build" option. Plaintiffs and other FEIS commenters, including the Town of Chevy Chase and their experts, expressed concerns similar to those they made on the AA/DEIS. AR0278819-849. As later noted by plaintiffs in their comments on the Permit application, all of these materials, inclusive of experts' reports on less environmentally harmful approaches, were readily available to defendants in the Administrative Record for the Project's AA/DEIS and FEIS. AR0278822-23.

The FEIS established what MTA viewed as the Project's three purposes as follows:

> (1)    Provide faster, more direct, and more reliable east-west transit service connecting the major activities in the Purple Line corridor at Bethesda, Silver Spring, Takoma/Langley Park, College Park, and New Carrollton;

> (2)    Provide better connections to Metrorail services located in the corridor; and

> (3)    Improve connectivity to the communities in the corridor located between the Metrorail lines.

AR0277180; AR0275466. Based on the FEIS and AA/DEIS, and their supporting technical and other design documents, FTA issued the Project's Record of Decision (ROD) in March 2014, certifying NEPA compliance. AR0275467.

**B.      USACE Assessment of the Project Under the CWA and the Guidelines**

Defendants' environmental assessment, statement of findings and Guidelines evaluation of the Project for purposes of acting on the Permit application is set forth in a March 12, 2018 "Memorandum for Record," signed by USACE staff member Maria N. Teresi and defendant DaVia. (Record Memo). AR0277167-218. [4]

During the period of FTA/MTA development of the AA/DEIS and FEIS, USACE was not a cooperating agency on its development. Record Memo at 12. Staff's involvement in the entire EIS process was limited and sporadic.[5] As is shown below, this fateful decision by MTA meant defendants had no direct voice in developing the alternatives considered in the EIS process. Plaintiffs view this as a pivotal factor in the inadequacy of the MTA's presentation of alternatives for review and approval of the CWA Permit, as discussed below.

---

[4] The "Record Memo" is what defendants refer to as the "Decision Document." It incorporates the defendants' findings and conclusions contemporaneous with and leading to issuance of the Permit. As such it is pivotal to the assessment of plaintiffs' claims in this action, and it is referred to throughout this Memorandum. For convenience and simplicity, the Record Memo will be cited herein with reference only to its internal pagination, i.e., without further reference to its AR pagination.    It is the first document in plaintiffs' AR Appendix.

[5] USACE staff did attend: (a) an MTA scoping meeting early in the process, i.e., on September 25, 2003, (b) MTA field reviews on May 8, and 9, 2012 (for jurisdictional determination purposes); (c) wetland and stream mitigation meetings and field reviews on October 25 and November 28, 2012; and (d) one-day field visits on July 30, 2013 and June 15, 2017, for identification of impacted waters. Record Memo 16. Through these interactions and other unspecified interagency meetings and conference calls, defendants were able to make a jurisdictional determination on February 24, 2014 that the Project may impact Waters of the United States. *Id.*

Defendants' Permit review began by noting the Project's purposes as set forth by MTA (quoted above). Defendants did not disagree with MTA's formulation, concluding that, as determined by the Corps, the "basic project purpose" is "mass transit service." *Id.* at 14. The Record Memo then concludes that the Project is **not** "water dependent," because "[t]he activity does not require access or proximity to or siting within a special aquatic site to fulfill its basic purpose." *Id.* Then in words echoing MTA's description (above), the Record Memo states the "Overall project purpose, as determined by the Corps" to be:

> To provide an expedited east-west mass transit service connecting major activity centers in a corridor extending from Bethesda to New Carrollton; to provide improved connections and travel times to the Metrorail services located in the corridor; and to improve connectivity to the communities in the corridor located between the Metrorail lines.

*Id.* In this action, plaintiffs do not disagree with the defendants' determination of (a) the basic Project purpose; (b) the non-water dependency of the Project; or (c) the Overall project purpose, all as set forth in the Record Memo.

Defendants established a public comment period on the Permit application that ran from September 13, 2016 through December 2, 2016. Defendants held two public meetings on the Permit application, one in Silver Spring, Maryland on October 17, 2016 and the other in Hyattsville, Maryland on October 18, 2016. *Id.* at 15. Plaintiffs, among others expressing water pollution concerns, submitted written comments in opposition to the Permit during the comment period. AR0278427-30; AR0278437-40; AR0278647; AR0278822; AR0278819-49. These comments included the claim that there were practicable and less environmentally damaging alternatives available for the Project. Plaintiffs Fitzgerald and Scensny attended the Silver Spring meeting and testified in opposition to the grant of the Permit. AR0279319-21. Additional expert

analyses confirming the continuing deficiencies in the MTA's assessment of alternatives were submitted to the Corps as part of or appended to plaintiffs' testimony in opposition to the Permit. These included two analyses by Ph.D. economist Frank Lysy, AR0278862-79; one by Marty Saggese, the former Vice President of the Long Island Railroad, AR0278880-85; and one by William Allen, an expert in ridership projections. AR0278886-91.

On January 23, 2017, defendants forwarded public comments received during the comment period to MTA, requesting that the comments be addressed and requesting additional information. AR0278152-154; Record Memo.15; On March 2, 2017, MTA responded in writing with a cover memo and nine attachments addressing defendants' request and responding to other public and agency comments. AR0278078-156.

Defendants' analysis of MTA's compliance with the CWA and the Guidelines is set forth in paragraphs 5 and 6 of the Record Memo at 17-33. The analysis begins with a proper acknowledgement that an evaluation of alternatives is required in this case, due to the anticipated discharge of dredged or fill material into the Waters of the United States, and that "no alternative may be permitted if there is a less environmentally damaging practicable alternative." *Id.* at 17. Defendants further state that "In order to be practicable, an alternative must be available, achieve the project purpose (as defined by the Corps), and be feasible when considering cost, logistics and existing technology." *Id.* Plaintiffs take no exception to these expressions of law.

As detailed in the Record Memo at 17-22, the alternatives analysis conducted by defendants consisted primarily of a brief review of the AA/DEIS Definition of Alternatives Technical Report (MTA Technical Report). AR0268361-501. In other words, defendants did not consider any alternatives other than those already considered by MTA in the NEPA process, and

MTA provided no other alternatives for consideration. The MTA Technical Report discusses eight alternatives: three LRT alternatives (low, medium and high investment); three bus rapid transit (BRT)[6] alternatives (low, medium and high investment); a "no build" alternative, and a Transportation System Management (TSM)[7] alternative. AR0268382-431. The end result of the AA/DEIS process was the 2009 selection by Maryland of the medium-investment LRT option as the Locally Preferred Alternative. Record Memo at 12.

The Record Memo identifies each of the five "build" alternatives discussed in the MTA Technical Report not chosen by MTA, and then purports to determine if any were a practicable alternative in light of the overall project purposes.[8] For all of them, defendants concluded that

---

[6] The BRT transit mode is described by MTA as follows: "BRT looks and feels much like a railcar but uses rubber wheeled vehicles. It can operate either on city streets or in a separate busway. BRT is generally faster than traditional local bus service. Like a rail system it has permanent stations, services, and amenities. Vehicles are typically fueled with low emission hybrid electric motors or Compressed Natural Gas. BRT vehicles are typically low floor, making them easier to board, and often have several doors for faster boarding. Features generally associated with a BRT system include signal priority at intersections, queue jump lanes, and off board fare collection. One advantage of BRT service is that the buses are not restricted to a specially constructed guideway but can operate on regular streets to provide 'one seat' feeder bus service." AR0268372-373.

[7] The TSM Alternative, as described by MTA, "represents the best that can be done for mobility without constructing a new transit guideway. Generally, the TSM Alternative emphasizes upgrades in transit service through operational and small physical improvements, plus selected roadway upgrades through intersection improvements, minor widenings and other focused traffic engineering actions. A TSM Alternative normally includes such features as bus route restructuring, more frequent bus service, expanded use of articulated busses to reduce overcrowding for passengers, bus lanes, special bus ramps on freeways, expanded park-and-ride facilities, express and limited stop service, signalization improvements, and improved transfer operations." AR0268398.

[8] The nomenclature of the alternatives used in the Record Memo at 18-22 is not consistent. It can be decoded as follows: High LRT = LRT 3; Medium LRT = LRT 2; Low LRT = LRT 1; High BRT = BRT 1; Medium BRT = BRT 2; and Low BRT = BRT 3. Further adding to the Record Memo's evident confusion, ¶ 5.2.2 repeatedly refers back to non-existent sections of the AA/DEIS Definition of Alternatives Technical Report. In order of appearance, the erroneous citations are

the "alternatives are not the least damaging practicable alternatives in light of the overall project purposes." Record Memo at 24. Defendants also concluded that the "no action alternative and the TSM alternative do not meet the overall project purpose and are, therefore, not practicable alternatives." *Id.* The Record Memo also briefly notes that seventeen additional alternatives were identified in the MTA Technical Report and that MTA dropped them "from further study for a variety of reasons." *Id.* at 21.

The Record Memo, rather than analyze possible options in relation to the criteria for evaluating practicable alternatives under the CWA and the Guidelines, simply notes the factors relied upon by MTA to choose the Medium Investment LRT alternative for the Purple Line. These factors included considerations that likely influenced MTA to choose the Medium LRT option, but have no bearing on selection of the least environmentally damaging practicable alternative in light of the overall project purposes.[9] The Record Memo further notes that FTA and MTA had concluded in a later analysis "that the basis for selecting light rail over BRT or other alternatives remains valid." *Id.*[10]

---

set forth below with the correct reference shown in parentheses: 2.4.8 (2.3.7); 2.4.1 (2.3.1); 2.4.4 (2.3.4); 2.4.6 (2.3.5); 2.4.3 (2.3.3); 2.4.6 (2.3.6); and 2.4.8 ( 2.3.8).

[9] They included, *inter alia,* "greater capacity to accommodate long-term growth and consistency with local land use and economic development plans." Record Memo at 24.

[10] The Record Memo explains that this analysis was submitted by MTA to and concurred in by FTA in December 2016, and that the MTA concluded that a decline in Metrorail ridership "would not significantly affect the purpose and need, the alternatives analysis, or the environmental effects for the project, as set forth in the FEIS." *Id.* at 16. The analysis is described under section 4.3 of the Record Memo, the section labeled for discussion of comments received that "address activities and/or comments outside of the Corps' purview." *Id.* The Record Memo neither discloses nor analyzes any information in this newer MTA/FTA analysis bearing upon the criteria for evaluating practicable alternatives under the CWA and the Guidelines, and thus does not explain why it was outside the Corps' "purview" to consider this information relevant to its assessment. This is a glaring omission, given that MTA had newly determined that the Project would still be viable without any of the 27% or 40% of riders in its FEIS and AA/DEIS projections, respectively, that

The Record Memo then concludes that the Medium LRT alternative is the "[l]east environmentally damaging alternative under the 404(b)(1) Guidelines." *Id.* at 21. The Record Memo notes that while this option "has higher stream impacts than certain other build alternatives," *id.*, it "has significantly lower wetland impacts than all other build options." *Id.* The Record Memo finds that this option, approved by the Permit, will "permanently impact 0.49 acres of wetlands and 5,108 linear feet of streams." *Id.*

## C.    The Missing Less Environmentally Damaging Practicable Alternative

Based on a review of the record before defendants, it is apparent that MTA relied primarily on information in the AA/DEIS and its associated Technical Reports to demonstrate compliance with the CWA and Guidelines regarding whether there were any practicable alternatives to the Locally Preferred Alternative described in the FEIS. The record also establishes that defendants did not expressly require MTA to explain in detail why its NEPA-based analysis of alternatives justified a CWA-based finding that there was no practicable alternative to the FEIS; Locally Preferred Alternative. Given that MTA chose not to make USACE a cooperating agency in the EIS process, it is unsurprising that the resulting AA/DEIS and FEIS do not directly address the CWA/Guidelines standards and requirements, which, as detailed above, require evaluation of alternatives to the Locally Preferred Alternative under specific substantive criteria that are different from the criteria under which alternatives are generally evaluated under NEPA.

Under these circumstances, while defendants could review the alternatives analysis developed under NEPA by an applicant, its "review is to be supplemented with any additional

---

would connect to or from the Metro system. See the Travel Demand Forecasting Technical Report (Sept. 2008). AR0272346-407, and particularly AR0272370, Table 2-9 of that Report.

information needed to consider the alternatives in sufficient detail to respond to the requirements in the Guidelines." 40 C.F.R. §§ 230.10(a)(4) & (5). But in this instance, defendants' analysis of the Permit application for practicable alternatives consisted simply of reviewing the AA/DEIS alternatives and selecting from among the six "build" options the one that was deemed by MTA to be the least environmentally damaging among those options. Record Memo at 21-22. Defendants' analysis did not acknowledge and purport to rebut the CWA-grounded presumption that a practicable alternative with less environmental impact of the Waters of the United States exists. And for its part, MTA operated as if no such presumption existed, as it did not attempt to rebut the possible existence of a less environmentally damaging alternative to the one it was proffering by showing that any less damaging alternative would not be practicable given the overall project purpose.

The record documentation supplied by MTA goes far to explain MTA's reluctance to discuss the practicability of less environmentally damaging alternatives. What has been disclosed amply supports, rather than rebuts, the very likely existence of a less environmentally damaging practicable alternative. Specifically, the Technical Report (at 1-9 to 1-10) identifies three types of guideway for both the BRT and LRT modes of operation, as follows:

- Shared-use lanes– When transit vehicles travel in mixed traffic, they are subject to the same speed restrictions and congestion as general traffic. Current bus service in the corridor makes use of shared-use lanes, as does the No Build. Where there is little congestion, limited right-of-way, or high monetary or environmental costs, shared-use lanes can be the best option.

- Dedicated Surface Lanes– There are number of ways to dedicate surface lanes on existing roads for transit use. Depending on available right-of-way, traffic volumes, parking needs, and alternative design, transit vehicles would travel either in the curb

lane or the median of a roadway. General traffic would be able to cross dedicated lanes.

- Exclusive Guideway (tunnels, transit-only lanes, and elevated segments) – Where BRT or LRT vehicles travel in tunnels, elevated segments, or along new alignment, the guideway would be for the exclusive use of transit vehicles. General traffic would not be permitted access to these guideways.

AR0268373-74.

The Technical Report (Table 2-11 at 2-15), AR0268396, makes clear that whether the Purple Line is a BRT or an LRT project, and regardless of the level of investment in exclusive guideway lanes, it will employ a mix of the three guideway options, as necessary and appropriate at a given location, resulting in differing amounts of mileage for each guideway option for the six build alternatives.    Elsewhere in the Technical Report, various guideway configurations are shown, making clear that the width of the right-of-way varies according to the guideway configuration selected in any given location. *Id.* at 2-14, 2-16, 2-20, 2-23, and 2-24. AR0268395, -397, -401, -404 and -405.

Further, the AA/DEIS at 4-69, AR0012138, makes clear that the adverse impact on wetlands is tied directly to the right-of-way width selected at the stream crossings:

Most of the wetlands identified along the alignments fall outside the limits of disturbance for the project. Impacts that do occur are primarily related to streams that cross perpendicular to the project or parallel the roadway and would be affected when existing roads are widened to accommodate the transitway.

The Record Memo also makes clear that if the existing bridges that cross the streams are not "widened to accommodate the transitway," there will be no adverse environmental impact on the Waters of the United States. It states that because the TSM alternative does not involve the construction of a new transit guideway, it "would not have any impacts to waters of the U.S."

Record Memo at 19. In addition, it was clear that the Low BRT option employed a different routing than the other five options compared to it, *id.* at 20, and defendants found that most of the stream impacts for all options come from "the extension of culverts or pipes at stream crossings and the relocation or piping of roadside streams or ditches." *Id.* at 25. Based upon these record facts, it is more than plausible that some configuration of a BRT system – one with a transit guideway for most of the Project route that eschews or avoids the widening of bridges along the route, and the widening of the existing roadway where near wetlands -- would have less (or no) adverse environmental impact on the Waters of the U.S. than the medium investment LRT option chosen.

The Record Memo does cursorily address facts relating to the practicability of the BRT alternatives, focusing on end-to-end transit times. It states that "light rail is faster than BRT by 9 to 14 minutes for an end-to-end trip and provides 20 to 27% reduction in ridership travel time." *Id.* at 19.[11] It also addresses factors that are, at best, only marginally relevant to the Corps-determined Overall project purpose: higher ridership projections for LRT than BRT modes; BRT capacity constraints on long-term growth; and greater ability of LRT "to attract economic development and community revitalization." *Id.*

---

[11] The source of these data is not clearly explained, but the AA/DEIS contains two tables comparing travel times among the alternatives presented there, which show no difference in the end-to-end travel time for high investment BRT as compared to medium investment LRT (59 minutes). Table 2-9, Technical Report at 2-13. AR0268394. In addition, Table 2-10 breaks down these totals into station-to-station travel times, and comes up with a one-minute difference -- 59 for the LRT, 60 for the BRT (High). It also reports 73 minutes for the BRT (Medium) alternative. AR0268395. When these totals are measured against the current condition of 108 minutes of end-to-end travel time, *id.*, the LRT choice is a 45% improvement, the BRT (High) is a 44% improvement, and the BRT (Medium) is a 32% improvement.

## IV. STANDARD OF REVIEW

### A. <u>Administrative Procedure Act (APA) Standards</u>

Under the APA, the Court "shall . . . set aside" an agency's decision if it is arbitrary, capricious, an abuse of discretion, or "otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A); *Defenders of Wildlife v. U. S. Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019). The Court must "perform a searching and careful review to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Sierra Club v. U.S. Dept. of Interior*, 899 F.3d 260 270 (4th Cir. 2018). Thus, a decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Defenders of Wildlife*, 931 F.3d at 345. In short, an agency decision cannot stand if the agency has "failed to present an adequate basis and explanation" for its decision, *State Farm*, 463 U.S. at 34, including "a rational connection between the facts found and the choices made." *Id.* at 42-43. In this evaluation, the Court "must judge the propriety of [the agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Finally, in order to maintain this action, plaintiffs must meet the standing requirements set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).[12]

---

[12] Plaintiffs' standing declarations have been submitted to accompany their motion for summary judgment. They state facts detailing plaintiffs' cognizable injury under both Article III and prudential standing criteria.

### B. Summary Judgment Standards

To be successful, the moving party on a motion for summary judgment must demonstrate that the absence of a genuine dispute as to any material fact, as well as entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Only disputes over facts that might affect the outcome of the case under the governing law can preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. Summary judgment is considered especially appropriate for APA actions, i.e., to decide whether, as a matter of law, an agency's action is properly supported by its administrative record and is otherwise consistent with the APA standard of review. *Source America v. U.S. Dept. of Education*, 369 F.Supp. 3d 974, 986 (E.D. Va. 2019); *Southeast Conference v. Vilsack*, 684 F.Supp.2d 135, 142 (D.D.C. 2010); *Theodore Roosevelt Cons. Partnership v. Salazar*, 605 F. Supp. 2d 263, 271 (D.D.C. 2009).

## V. THE PERMIT WAS ISSUED IN VIOLATION OF THE CWA

### A. Under CWA Standards, Defendants Had to Rebut the Presumption That No Less Damaging Practicable Alternative Using BRT Would Fulfill the Overall Project Purpose

As detailed above, defendants' statement of the "Overall project purpose" closely tracks the MTA's corresponding statement of the Project's three purposes, as set forth in the FEIS. In neither case, however, is the Project's purpose or purposes limited to transit options exclusively employing a light-rail mode of transport. In fact, a number of the alternatives considered by MTA and the Corps eschew light rail completely, employing various BRT options. This necessarily means that defendants could not rule out all BRT options on the grounds that MTA had selected a light-rail option as the only transit mode to be considered in meeting the Overall project purpose.

In fact, the Record Memo at 14 concludes that the "basic project purpose" is "mass transit service," not "light-rail transit service." Thus, defendants had to be satisfied that there was, first of all, no non-light rail "mass transit service" alternative that would not require dredging or filling of U. S. waters, and if so, that there was no less environmentally damaging practicable alternative ("LEDPA") that would fulfill the Corps-defined "Overall project purpose," whether presented by the applicant or not. Indeed, because this is a Project whose basic purpose—mass transit service- - is not water dependent, MTA was obliged, under Section 404 of the CWA and the EPA/USACE Guidelines to rebut the LEDPA presumption with a clear and convincing demonstration that no such BRT practicable alternative meeting the Overall project purpose is available. 40 C.F.R. § 230.10(a)(3).

> **B.** **Defendants Failed to Rebut the LEDPA Presumption**
>
> > **1.** **Defendants Accepted MTA's Exclusive Reliance on Its NEPA-Based Alternatives Analysis**

As detailed above, the Record Memo makes clear that MTA's presentation to the Corps on CWA compliance was essentially, if not entirely, grounded in MTA's NEPA-based analysis leading to selection of a light-rail option over any BRT option. But the NEPA analysis, as set forth in the AA/DEIS and the FEIS, did not address the substantive criteria that must be used by USACE under the CWA for an individual Section 404 Permit, whose threshold, core focus is on pollution and other negative impacts on the Waters of the United States. One is left to wonder, as it is not explained on this record, why MTA would not follow the strongly recommended process of including USACE as a cooperating agency in the AA/DEIS and FEIS process, so that only alternatives that could then pass muster under CWA standards would be examined. The MTA

strategy appears to have been to disregard the CWA hurdle until the last minute (having filed their Permit application on August 1, 2016—three years after the FEIS was issued and about 2.5 years after USACE made its jurisdictional determination). This was, of course, long after a NEPA-based alternative was selected and was being implemented, apparently in the hope and expectation that USACE would be satisfied from MTA's belated Permit application that MTA had already exhausted the possible range of less environmentally damaging alternatives in the NEPA process.[13]

On this record, that indefensible strategy has, thus far, worked. Defendants simply concluded, in awarding the Permit to MTA's medium investment LRT option, that among the six build options proffered by MTA, the other five were "not the least damaging practicable alternatives in light of overall project purposes," in that "each impact more waters of the U.S. than the locally preferred alternative." Record Memo at 24. This level of reasoning makes about as much sense as a pro football team inexplicably limiting its first round selection on draft day to draft picks whose last name begins with one of the letters A through F.

---

[13] By declining to make USACE a cooperating agency and delaying its CWA application until long after FEIS approval, MTA also stripped plaintiffs of the ability to bring a consolidated legal action challenging both the FEIS and the CWA Permit. Two of the plaintiffs in this action were plaintiffs in a challenge to the FEIS – a challenge that, due to statute of limitations considerations, had to be filed long before MTA even made application for the Permit challenged here. MTA's strategic choice not only deprived plaintiffs and reviewing courts of the timely, coordinated interdependent review that should have occurred, it also has placed plaintiffs in the unenviable position of seeking judicial review on a project that day-by-day, inches toward completion. At this juncture, however, only a first small section of track has recently been laid near the eastern terminus and the uncertain targeted completion date is still several year away, i.e., 2022-23. https://wtop.com/dc-transit/2019/09/1st-section-of-purple-line-rail-is-laid/.

## 2. Defendants Made Legally Insufficient LEDPA Findings When They Improperly Allowed MTA To Categorically Rule Out All BRT Options

In apparent furtherance of its strategy, MTA, in its presentation of CWA Permit compliance to defendants, argued in effect that no TSM or BRT option could fulfill the purpose of the Project. It did so not by directly claiming or demonstrating that no possible BRT configuration could fulfill the Corps-defined overall Project purpose, but rather by arguing that **other** purposes sought by MTA could not be met, or not met as well, with a BRT option: higher ridership levels; fewer capacity constraints on long-term growth; and greater consistency with local land use and economic development plans. AR0278131 (citing the FEIS at 2-11 to 2-12). In short, MTA employed a have-its-cake-and-eat-it-too strategy: let the public believe, through its NEPA-based Alternatives Analysis, that it was genuinely considering BRT as among the universe of "mass transit service" options to be assessed as within the basic project purpose, while all along intending to select the LRT mode, given MTA's belief that it would better fulfill goals **other than those enumerated in the overall project purpose.**[14] Nevertheless, MTA chose not to level with the public about its intentions by specifying true intent, i.e., that the basic purpose of the Project was not "mass transit service," but rather "LRT transit service." At this juncture, however, neither MTA nor defendants can disavow BRT as an option on grounds unrelated to the elements actually expressed in the "Overall project purpose," as defined by defendants.

---

[14] Indeed, MTA expressly mentions in its CWA submissions that LRT, compared to BRT, provides greater "consistency with local land use and economic development plans." AR0278131. This reason for MTA favoring LRT over BRT was quite apparent long before MTA's submission to the Corps; it is in the FEIS. AR0278124.

In a much more straightforward approach, MTA could have attempted to demonstrate that any BRT-only scenario would result in not achieving the Overall project purpose of (a) "expedited east-west transit service connecting major activity centers in [the Bethesda-New Carrolton] corridor;" (b) providing "improved connections and travel times to the Metrorail services located in the corridor;" and (c) improving "connectivity to the communities in the corridor located between the Metrorail lines." Record Memo at 14 (stating the "Overall project purpose"). MTA's argument would necessarily have to be that no BRT-only scenario is "practicable" after "taking in to consideration cost, technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). But MTA did not try to defend its limited analysis of alternatives in this way. It did not discuss any BRT-grounded alignment of guideway and road widths outside what had been considered in the NEPA process and made no claim that BRT options had to be ruled out on considerations of "cost, technology and logistics."

3. **The Record Does Not In Any Event Rebut the LEDPA Presumption As Applied to Possible BRT Alternatives**

Focusing on the three-part Overall project purpose as determined by defendants, the Record Memo cites no MTA evidence that all practicable BRT options would fail to provide improved connections to Metrorail or fail to improve community connectivity. Instead, the Record Memo focus on only the first factor: the length of the travel time between points on the Purple Line route. But as detailed above, the evidence presented by MTA showed that in some point-to-point trips, the difference in time between LRT and BRT is negligible and that in others, both are a significant improvement over existing travel times (by about 40%), and that a high-investment BRT configuration could achieve up to 90% of the travel time improvement of the light-rail locally

preferred option. This small difference would hardly seem sufficient to justify dismissing all BRT options, but in any event this is not how MTA justified its claim of CWA compliance, nor is it how defendants sought to justify their acceptance of MTA's claim of CWA compliance.[15]

The impact of these evidentiary omissions and demonstrations is fatal to the Permit. Defendants failed to require MTA to demonstrate that "expedited east-west transit service"—the only characteristic of BRT even arguably at issue as adequate in meeting the Overall project purpose – could not be achieved by some different "mass transit service" choice than the chosen LRT option. MTA's choice, uncritically accepted by defendants, requires widened bridges whose construction would disfigure wetlands and pollute the Waters of the United States.[16] By contrast, as detailed above from the Record, none of the BRT options require bridge widening. Indeed, the Record makes starkly clear that bridge widening, essential only to the LRT options, is the key factor leading to the discharge of pollutants into the Waters of the U.S. Record Memo at 19.

Defendants allowed MTA to ignore the prospect of a BRT configuration with unwidened bridges and the inherent flexibility to mix dedicated or exclusive transitways with shared use roadways. It is more than plausible that a BRT alignment, selectively complementing the Project

---

[15] That approach would require MTA to seek a rewriting of the first factor in the Overall project purpose to read "expedited east-west mass transit service to the maximum possible extent." That is simply not how defendants expressed the Overall project purpose, and what the Corps' purpose statement says is squarely in line with MTA's own description of the Project's first purpose, i.e., to "provide faster, more direct, and more reliable east-west transit service. . ." AR0275466.

[16] Although defendants assert the harms would be largely temporary, the record includes the Hazardous Materials Technical Report from the AA/DEIS of 2008, AR0269391-625, which identified 240 properties of potential concern, of which 107 were likely to contain possible high levels of one or more of a long list of materials presenting long-lasting hazards to human health and the health of aquatic ecosystems. AR0269416-417, 465. The Report concludes that during the course of project planning, properties with high potential for concern should be avoided to the extent possible. AR0269477.

with TSM strategies along the route to minimize stream and wetland damages, would meet the Overall project purpose. Indeed, as detailed above, plaintiffs and the leaders and experts of the Town of Chevy Chase, speaking on behalf of Town residents, repeatedly emphasized this point to MTA during the EIS processes, and plaintiffs and others presented updated information of this critical environmental concern to defendants in the CWA hearing process. Defendants' uncritical LEDPA evaluation cannot be squared with the CWA, as MTA had the burden of providing detailed, clear and convincing information proving that no practicable BRT mode choice, given realistic guideway configuration and routing choices, would meet the Overall Project purpose and not pollute (or minimize the pollution of) the Waters of the United States. 40 C.F.R. § 230.10(a)(3). Nor did defendants cure this omission by making their own independent determination that there is no practicable alternative to the one advanced by MTA that either does no environmental damage or, at the least, less environmental damage, to the Waters of the U.S.

Plaintiffs note further that it is not their burden to cure the evidentiary deficiency in the record, i.e., to supply information not supplied by MTA nor demanded or adduced by defendants regarding the one element in the Overall project purpose that was subject to question in the evaluation of compliance with that purpose--the additional travel time that could be projected for an environmentally less damaging BRT alternative as compared to MTA's medium investment LRT option. Plaintiffs believe it more than merely plausible that (a) unwidened bridges would not materially add to BRT travel time, and certainly not to the extent that the Overall project purpose could not be met; (b) BRT guideway could be selectively configured to avoid discharges in the Waters of the U.S. and the destruction of wetlands, while maximizing dedicated or exclusive lanes elsewhere; and (c) a configuration along these lines would also be effective in reducing congestion,

as wetland areas tend not to be congested areas in the first place. But the credibility of plaintiffs' expectations in this regard are, at this juncture, legally beside the point. It is up to MTA, or in its absence, defendants, to rebut the presumption that such a less environmentally damaging alternative meeting overall project purposes exists. The legally flawed record simply reveals no attempt to present or consider any such obvious alternative.

Accordingly, the Permit cannot stand under APA 6706(2)(A) standards, for one or more of the following reasons: (1) defendants have entirely failed to consider an important aspect of their obligation to evaluate less environmentally damaging practicable alternatives under the 404(b)(1) Guidelines; (2) defendants have offered an explanation for issuance of the Permit that runs counter to the evidence before them in this case; or (3) defendants determination of the least environmentally damaging practicable alternative under the 404(b)(1) Guidelines is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

Most prominent in defendants' legally deficient LEDPA analysis is the absence of any finding by defendants that guideway and transit choices (and, hence, right-of-way width choices), other than as MTA desires in its Locally Preferred Alternative, made with a clear, single-minded focus on the CWA goal of reducing or eliminating adverse environmental impacts to the Waters of the United States, was not an alternative "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In support of this conclusion, plaintiffs have refrained from extended discussion of other CWA cases grounded in claims of inadequate LEDPA analysis; each case is based on a unique set of facts that cannot dictate the outcome in any other. Plaintiffs do note,

however, that it would hardly be a novel outcome for this Court to invalidate a CWA permit where, as here, USACE relied exclusively on a NEPA-based alternatives analysis that did not take into account the more demanding analysis required of alternatives under the CWA. For example, in *Alliance to Save the Mattaponi v. USACE*, 606 F.Supp. 2d 121 (D.D.C. 2009), the court, after noting that the Corps had concluded that the NEPA-based FEIS "provides sufficient information regarding alternatives to be evaluated under [the CWA] Guidelines," 606 F.Supp. 2d at 128, concluded that for this reason, the Corps "limited its scope to those alternatives deemed practicable in the final EIS." *Id.* Examining the Corps' cursory treatment of non-EIS alternatives, the court concluded as follows:

> Before determining that a Project that would flood 403 acres of functioning wetlands is the least-damaging practicable alternative, the Corps must do more than give vague explanations about the potential adverse effects of or potential political opposition to other alternatives. It must explain fully, based [on]an analysis adequate to the task, why other alternatives are either impracticable or more damaging.

> The Clean Water Act "compels that the [least-damaging] alternative be considered and selected unless proven impracticable." *Utahns for Better Transp. V. U.S. Dep't of Transp.*, 305 F.3d 1152, 1189 (10th Cir. 2002). The court finds that the Corps acted arbitrarily and capriciously when it found that the Reservoir Project was the least damaging practicable alternative based on its assertions that other alternatives *may* not meet needs and *could* be more damaging. The Corps must adequately explain why there is no less-damaging practicable alternative. If the Corps cannot so explain based on the record before it, it must reconsider its determination based on an adequate analysis of the alternatives.

*Id.* at 130 (emphasis in original).

In *Mattaponi*, the Corps at least attempted to explain its rejection of non-EIS alternative and found them wanting. Here, by contrast, the Record Memo does not even purport to analyze

and reject any alternative not included in the Projects AA/DEIS or FEIS. In short, the case for Permit vacatur is even stronger here than it was in *Mattaponi*.

## VI. CONCLUSION

In view of the CWA violations set forth in the complaint and discussed herein, defendants' acts and omissions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A). Accordingly, plaintiffs respectfully request that the Court issue appropriate declaratory relief and vacate the Permit. A proposed order of vacatur is enclosed.

Respectfully submitted,

**KNOPF & BROWN**

David W. Brown
401 E. Jefferson Street, Ste. 206
Rockville, MD 20850
brown@knopf-brown.com
(301) 545-6100
**Attorneys for Plaintiffs**

September 19, 2019

# ADDENDUM OF PERTINENT
# STATUTUES AND REGULATIONS

Page

**Statutes**

5 U.S.C. §706                                    AP-1

33 U.S.C. §1251(a)                               AP-3

33 U.S.C. §1311(a)                               AP-5

33 U.S.C. §1344(a), (b)(1), (d)                  AP-6


**Regulations**

33 C.F.R. 320.1                                  AP-8

33 C.F.R. 320.4(a)(2)                            AP-10

33 C.F.R. Part 325 Appx. B, ¶8.c.                AP-11


40 C.F.R. 230.10                                 AP-14

40 C.F.R. 1501.6                                 AP-16

40 C.F.R. 1506.3, 1506.5                         AP-20

40 C.F.R. 1508.5                                 AP-23


**Federal Register**

45 Fed. Reg. 85336-39 (Dec. 24, 1980)            AP-25

LII > U.S. Code > Title 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
> Part I. THE AGENCIES GENERALLY > Chapter 7. JUDICIAL REVIEW
> Section 706. Scope of review

# 5 U.S. Code § 706. Scope of review

U.S. Code      Notes

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   **(B)** contrary to constitutional right, power, privilege, or immunity;

   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   **(D)** without observance of procedure required by law;

   **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

## 💼 U.S. Code Toolbox

Law about... Articles
from Wex
Table of Popular Names
Parallel Table of
Authorities
How current is this?

LII  > U.S. Code  > Title 33. NAVIGATION AND NAVIGABLE WATERS
> Chapter 26. WATER POLLUTION PREVENTION AND CONTROL
> Subchapter I. RESEARCH AND RELATED PROGRAMS
> Section 1251. Congressional declaration of goals and policy

# 33 U.S. Code § 1251. Congressional declaration of goals and policy

U.S. Code      Notes

**(a) RESTORATION AND MAINTENANCE OF CHEMICAL, PHYSICAL AND BIOLOGICAL INTEGRITY OF NATION'S WATERS; NATIONAL GOALS FOR ACHIEVEMENT OF OBJECTIVE** The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

  **(1)** it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

  **(2)** it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

  **(3)** it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

  **(4)** it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

  **(5)** it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants AP-3 State;

**(6)** it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

**(7)** it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

**(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States**

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

**(c) Congressional policy toward Presidential activities with foreign countries**

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

LII  > U.S. Code  > Title 33. NAVIGATION AND NAVIGABLE WATERS
> Chapter 26. WATER POLLUTION PREVENTION AND CONTROL
> Subchapter III. STANDARDS AND ENFORCEMENT  > Section 1311. Effluent limitations

# 33 U.S. Code § 1311. Effluent limitations

U.S. Code     Notes

**(a) ILLEGALITY OF POLLUTANT DISCHARGES EXCEPT IN COMPLIANCE WITH LAW**

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

**(b) TIMETABLE FOR ACHIEVEMENT OF OBJECTIVES** In order to carry out the objective of this chapter there shall be achieved—

**(1)**

**(A)** not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

**(B)** for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this

:

LII > U.S. Code > Title 33. NAVIGATION AND NAVIGABLE WATERS
> Chapter 26. WATER POLLUTION PREVENTION AND CONTROL
> Subchapter IV. PERMITS AND LICENSES
> Section 1344. Permits for dredged or fill material

# 33 U.S. Code § 1344. Permits for dredged or fill material

U.S. Code      Notes

**(a) DISCHARGE INTO NAVIGABLE WATERS AT SPECIFIED DISPOSAL SITES**
The Secretary may issue permits, after notice and opportunity for public
hearings for the discharge of dredged or fill material into the navigable
waters at specified disposal sites. Not later than the fifteenth day after the
date an applicant submits all the information required to complete an
application for a permit under this subsection, the Secretary shall publish
the notice required by this subsection.

**(b) SPECIFICATION FOR DISPOSAL SITES**
Subject to subsection (c) of this section, each such disposal site shall be
specified for each such permit by the Secretary (1) through the application
of guidelines developed by the Administrator, in conjunction with the
Secretary, which guidelines shall be based upon criteria comparable to the
criteria applicable to the territorial seas, the contiguous zone, and the
ocean under section 1343(c) of this title, and (2) in any case where such
guidelines under clause (1) alone would prohibit the specification of a site,
through the application additionally of the economic impact of the site on
navigation and anchorage.

**(c) DENIAL OR RESTRICTION OF USE OF DEFINED AREAS AS DISPOSAL
SITES**
The Administrator is authorized to prohibit the specification (including the
withdrawal of specification) of any AP-6ed area as a disposal site, and he is

authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

### (d) "Secretary" defined
The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

### (e) General permits on State, regional, or nationwide basis

**(1)** In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.

**(2)** No general permit issued under this subsection shall be for a period of more than five years after the date of its issuance and such general permit may be revoked or modified by the Secretary if, after opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

### (f) Non-prohibited discharge of dredged or fill material

**(1)** Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

**(A)** from normal farming, silviculture, and ranching activities such

AP-7

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of September 16, 2019

Title 33 → Chapter II → Part 320 → §320.1

Title 33: Navigation and Navigable Waters
PART 320—GENERAL REGULATORY POLICIES

---

### §320.1  Purpose and scope.

(a) *Regulatory approach of the Corps of Engineers.* (1) The U.S. Army Corps of Engineers has been involved in regulating certain activities in the nation's waters since 1890. Until 1968, the primary thrust of the Corps' regulatory program was the protection of navigation. As a result of several new laws and judicial decisions, the program has evolved to one involving the consideration of the full public interest by balancing the favorable impacts against the detrimental impacts. This is known as the "public interest review." The program is one which reflects the national concerns for both the protection and utilization of important resources.

(2) The Corps is a highly decentralized organization. Most of the authority for administering the regulatory program has been delegated to the thirty-six district engineers and eleven division engineers. A district engineer's decision on an approved jurisdictional determination, a permit denial, or a declined individual permit is subject to an administrative appeal by the affected party in accordance with the procedures and authorities contained in 33 CFR part 331. Such administrative appeal must meet the criteria in 33 CFR 331.5; otherwise, no administrative appeal of that decision is allowed. The terms "approved jurisdictional determination," "permit denial," and "declined permit" are defined at 33 CFR 331.2. There shall be no administrative appeal of any issued individual permit that an applicant has accepted, unless the authorized work has not started in waters of the United States, and that issued permit is subsequently modified by the district engineer pursuant to 33 CFR 325.7 (see 33 CFR 331.5(b)(1)). An affected party must exhaust any administrative appeal available pursuant to 33 CFR part 331 and receive a final Corps decision on the appealed action prior to filing a lawsuit in the Federal courts (see 33 CFR 331.12).

(3) The Corps seeks to avoid unnecessary regulatory controls. The general permit program described in 33 CFR parts 325 and 330 is the primary method of eliminating unnecessary federal control over activities which do not justify individual control or which are adequately regulated by another agency.

(4) The Corps is neither a proponent nor opponent of any permit proposal. However, the Corps believes that applicants are due a timely decision. Reducing unnecessary paperwork and delays is a continuing Corps goal.

(5) The Corps believes that state and federal regulatory programs should complement rather than duplicate one another. The Corps uses general permits, joint processing procedures, interagency review, coordination, and authority transfers (where authorized by law) to reduce duplication.

(6) The Corps has authorized its district engineers to issue formal determinations concerning the applicability of the Clean Water Act or the Rivers and Harbors Act of 1899 to activities or tracts of land and the applicability of general permits or statutory exemptions to proposed activities. A determination pursuant to this authorization shall constitute a Corps final agency action. Nothing contained in this section is intended to affect any authority EPA has under the Clean Water Act.

(b) *Types of activities regulated.* This part and the parts that follow (33 CFR parts 321 through 330) prescribe the statutory authorities, and general and special policies and procedures applicable to the review of applications for Department of the Army (DA) permits for controlling certain activities in waters of the United States or the oceans. This part identifies the various federal statutes which require that DA permits be issued before these activities can be lawfully undertaken; and related Federal laws and the general policies applicable to the review of those activities. Parts 321 through 324 and 330 address special policies and procedures applicable to the following specific classes of activities:

(1) Dams or dikes in navigable waters of the United States (part 321);

(2) Other structures or work including excavation, dredging, and/or disposal activities, in navigable waters of the United States (part 322);

(3) Activities that alter or modify the course, condition, location, or capacity of a navigable water of the United States (part 322);

(4) Construction of artificial islands, installations, and other devices on the outer continental shelf (part 322);

(5) Discharges of dredged or fill material into waters of AP-8 :d States (part 323);

(6) Activities involving the transportation of dredged material for the purpose of disposal in ocean waters (part 324); and

(7) Nationwide general permits for certain categories of activities (part 330).

(c) *Forms of authorization.* DA permits for the above described activities are issued under various forms of authorization. These include individual permits that are issued following a review of individual applications and general permits that authorize a category or categories of activities in specific geographical regions or nationwide. The term "general permit" as used in these regulations (33 CFR parts 320 through 330) refers to both those regional permits issued by district or division engineers on a regional basis and to nationwide permits which are issued by the Chief of Engineers through publication in the FEDERAL REGISTER and are applicable throughout the nation. The nationwide permits are found in 33 CFR part 330. If an activity is covered by a general permit, an application for a DA permit does not have to be made. In such cases, a person must only comply with the conditions contained in the general permit to satisfy requirements of law for a DA permit. In certain cases pre-notification may be required before initiating construction. (See 33 CFR 330.7)

(d) *General instructions.* General policies for evaluating permit applications are found in this part. Special policies that relate to particular activities are found in parts 321 through 324. The procedures for processing individual permits and general permits are contained in 33 CFR part 325. The terms "navigable waters of the United States" and "waters of the United States" are used frequently throughout these regulations, and it is important from the outset that the reader understand the difference between the two. "Navigable waters of the United States" are defined in 33 CFR part 329. These are waters that are navigable in the traditional sense where permits are required for certain work or structures pursuant to Sections 9 and 10 of the Rivers and Harbors Act of 1899. "Waters of the United States" are defined in 33 CFR part 328. These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Clean Water Act.

[51 FR 41220, Nov. 13, 1986, as amended at 64 FR 11714, Mar. 9, 1999; 65 FR 16492, Mar. 28, 2000]

Need assistance?

Act imposes a perpetual moratorium on the harassment, hunting, capturing, or killing of marine mammals and on the importation of marine mammals and marine mammal products without a permit from either the Secretary of the Interior or the Secretary of Commerce, depending upon the species of marine mammal involved. Such permits may be issued only for purposes of scientific research and for public display if the purpose is consistent with the policies of the Act. The appropriate Secretary is also empowered in certain restricted circumstances to waive the requirements of the Act.

(l) Section 7(a) of the Wild and Scenic Rivers Act (16 U.S.C. 1278 *et seq.*) provides that no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration.

(m) The Ocean Thermal Energy Conversion Act of 1980, (42 U.S.C. section 9101 *et seq.*) establishes a licensing regime administered by the Administrator of NOAA for the ownership, construction, location, and operation of ocean thermal energy conversion (OTEC) facilities and plantships. An application for an OTEC license filed with the Administrator constitutes an application for all federal authorizations required for ownership, construction, location, and operation of an OTEC facility or plantship, except for certain activities within the jurisdiction of the Coast Guard. This includes applications for section 10, section 404, section 103 and other DA authorizations which may be required.

(n) Section 402 of the Clean Water Act authorizes EPA to issue permits under procedures established to implement the National Pollutant Discharge Elimination System (NPDES) program. The administration of this program can be, and in most cases has been, delegated to individual states. Section 402(b)(6) states that no NPDES permit will be issued if the Chief of Engineers, acting for the Secretary of the Army and after consulting with the U.S. Coast Guard, determines that navigation and anchorage in any navigable water will be substantially impaired as a result of a proposed activity.

(o) The National Fishing Enhancement Act of 1984 (Pub. L. 98-623) provides for the development of a National Artificial Reef Plan to promote and facilitate responsible and effective efforts to establish artificial reefs. The Act establishes procedures to be followed by the Corps in issuing DA permits for artificial reefs. The Act also establishes the liability of the permittee and the United States. The Act further creates a civil penalty for violation of any provision of a permit issued for an artificial reef.

**t** Back to Top

### §320.4  General policies for evaluating permit applications.

The following policies shall be applicable to the review of all applications for DA permits. Additional policies specifically applicable to certain types of activities are identified in 33 CFR parts 321 through 324.

(a) *Public interest review.* (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among these are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines and criteria (see §§320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

(2) The following general criteria will be considered in the evaluation of every application:

(i) The relative extent of the public and private need for the proposed structure or work:

(ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

(3) The specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how important a factor is and how much consideration it deserves will vary with each proposal. A specific factor may great weight on one proposal, while it may not be present or as important on another. However, full consideration an appropriate weight will be given to all comments, including **AP-10** federal, state, and local agencies, and other exp matters within their expertise.

This permit becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below.

_____

(District Engineer)

_____

(Date)

When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property. To validate the transfer of this permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below.

_____

(Transferee)

_____

(Date)

B. Special Conditions. No special conditions will be preprinted on the permit form. The following and other special conditions should be added, as appropriate, in the space provided after the general conditions or on a referenced continuation sheet:

1. Your use of the permitted activity must not interfere with the public's right to free navigation on all navigable waters of the United States.

2. You must have a copy of this permit available on the vessel used for the authorized transportation and disposal of dredged material.

3. You must advise this office in writing, at least two weeks before you start maintenance dredging activities under the authority of this permit.

4. You must install and maintain, at your expense, any safety lights and signals prescribed by the United States Coast Guard (USCG), through regulations or otherwise, on your authorized facilities. The USCG may be reached at the following address and telephone number:

_____

_____

5. The condition below will be used when a Corps permit authorizes an artificial reef, an aerial transmission line, a submerged cable or pipeline, or a structure on the outer continental shelf.

National Ocean Service (NOS) has been notified of this authorization. You must notify NOS and this office in writing, at least two weeks before you begin work and upon completion of the activity authorized by this permit. Your notification of completion must include a drawing which certifies the location and configuration of the completed activity (a certified permit drawing may be used). Notifications to NOS will be sent to the following address: National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910-3282.

6. The following condition should be used for every permit where legal recordation of the permit would be reasonably practicable and recordation could put a subsequent purchaser or owner of property on notice of permit conditions.

You must take the actions required to record this permit with the Registrar of Deeds or other appropriate official charged with the responsibility for maintaining records of title to or interest in real property.

[51 FR 41236, Nov. 13, 1986, as amended at 62 FR 26230, May 13, 1997]

↑ Back to Top

**Appendix B to Part 325—NEPA Implementation Procedures for the Regulatory Program**

1. Introduction

2. General

3. Development of Information and Data

4. Elimination of Duplication with State and Local Procedu AP-11



5. Public Involvement

6. Categorical Exclusions

7. EA/FONSI Document

8. Environmental Impact Statement—General

9. Organization and Content of Draft EISs

10. Notice of Intent

11. Public Hearing

12. Organization and Content of Final EIS

13. Comments Received on the Final EIS

14. EIS Supplement

15. Filing Requirements

16. Timing

17. Expedited Filing

18. Record of Decision

19. Predecision Referrals by Other Agencies

20. Review of Other Agencies' EISs

21. Monitoring

1. *Introduction.* In keeping with Executive Order 12291 and 40 CFR 1500.2, where interpretive problems arise in implementing this regulation, and consideration of all other factors do not give a clear indication of a reasonable interpretation, the interpretation (consistent with the spirit and intent of NEPA) which results in the least paperwork and delay will be used. Specific examples of ways to reduce paperwork in the NEPA process are found at 40 CFR 1500.4. Maximum advantage of these recommendations should be taken.

2. *General.* This Appendix sets forth implementing procedures for the Corps regulatory program. For additional guidance, see the Corps NEPA regulation 33 CFR part 230 and for general policy guidance, see the CEQ regulations 40 CFR 1500-1508.

3. *Development of Information and Data.* See 40 CFR 1506.5. The district engineer may require the applicant to furnish appropriate information that the district engineer considers necessary for the preparation of an Environmental Assessment (EA) or Environmental Impact Statement (EIS). See also 40 CFR 1502.22 regarding incomplete or unavailable information.

4. *Elimination of Duplication with State and Local Procedures.* See 40 CFR 1506.2.

5. *Public Involvement.* Several paragraphs of this appendix (paragraphs 7, 8, 11, 13, and 19) provide information on the requirements for district engineers to make available to the public certain environmental documents in accordance with 40 CFR 1506.6.

6. *Categorical Exclusions*—a. *General.* Even though an EA or EIS is not legally mandated for any Federal action falling within one of the "categorical exclusions," that fact does not exempt any Federal action from procedural or substantive compliance with any other Federal law. For example, compliance with the Endangered Species Act, the Clean Water Act, etc., is always mandatory, even for actions not requiring an EA or EIS. The following activities are not considered to be major Federal actions significantly affecting the quality of the human environment and are therefore categorically excluded from NEPA documentation:

(1) Fixed or floating small private piers, small docks, boat hoists and boathouses.

(2) Minor utility distribution and collection lines including irrigation;

(3) Minor maintenance dredging using existing disposal sites;

(4) Boat launching ramps;

(5) All applications which qualify as letters of permission (as described at 33 CFR 325.5(b)(2)).

b. *Extraordinary Circumstances.* District engineers sh___ ___ ___ rt for extraordinary circumstances where norma___ excluded actions could have substantial environmental eff___us require an EA or EIS. For a period of one ye___ ___e effective data of these regulations, district engineers should maintain an information list on the type and number of categorical

AP-12

site and the only DA permit requirement relates to a connecting pipeline, supply loading terminal or fill road, that pipeline, terminal or fill road permit, in and of itself, normally would not constitute sufficient overall Federal involvement with the project to justify expanding the scope of a Corps NEPA document to cover upland portions of the facility beyond the structures in the immediate vicinity of the regulated activity that would effect the location and configuration of the regulated activity.

Similarly, if an applicant seeks a DA permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill. However, the NEPA review would be extended to the entire project, including portions outside waters of the United States, only if sufficient Federal control and responsibility over the entire project is determined to exist; that is, if the regulated activities, and those activities involving regulation, funding, etc. by other Federal agencies, comprise a substantial portion of the overall project. In any case, once the scope of analysis has been defined, the NEPA analysis for that action should include direct, indirect and cumulative impacts on all Federal interests within the purview of the NEPA statute. The district engineer should, whenever practicable, incorporate by reference and rely upon the reviews of other Federal and State agencies.

For those regulated activities that comprise merely a link in a transportation or utility transmission project, the scope of analysis should address the Federal action, *i.e.,* the specific activity requiring a DA permit and any other portion of the project that is within the control or responsibility of the Corps of Engineers (or other Federal agencies).

For example, a 50-mile electrical transmission cable crossing a $1\frac{1}{4}$ mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.

Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50-mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50-mile transmission line.

For those activities that require a DA permit for a major portion of a shoreside facility, the scope of analysis should extend to upland portions of the facility. For example, a shipping terminal normally requires dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function. Permits for such activities are normally considered sufficient Federal control and responsibility to warrant extending the scope of analysis to include the upland portions of the facility.

In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal.

8. *Environmental Impact Statement—General—a. Determination of Lead and Cooperating Agencies.* When the district engineer determines that an EIS is required, he will contact all appropriate Federal agencies to determine their respective role(s), *i.e.,* that of lead agency or cooperating agency.

b. *Corps as Lead Agency.* When the Corps is lead agency, it will be responsible for managing the EIS process, including those portions which come under the jurisdiction of other Federal agencies. The district engineer is authorized to require the applicant to furnish appropriate information as discussed in paragraph 3 of this appendix. It is permissable for the Corps to reimburse, under agreement, staff support from other Federal agencies beyond the immediate jurisdiction of those agencies.

c. *Corps as Cooperating Agency.* If another agency is the lead agency as set forth by the CEQ regulations (40 CFR 1501.5 and 1501.6(a) and 1508.16), the district engineer will coordinate with that agency as a cooperating agency under 40 CFR 1501.6(b) and 1508.5 to insure that agency's resulting EIS may be adopted by the Corps for purposes of exercising its regulatory authority. As a cooperating agency the Corps will be responsible to the lead agency for providing environmental information which is directly related to the regulatory matter involved and which is required for the preparation of an EIS. This in no way shall be construed as lessening the district engineer's ability to request the applicant to furnish appropriate information as discussed in paragraph 3 of this appendix.

When the Corps is a cooperating agency because of a regulatory responsibility, the district engineer should, in accordance with 40 CFR 1501.6(b)(4), "make available staff support at the lead agency's request" to enhance the latter's interdisciplinary capability provided the request pertains to the Corps regulatory action covered by the EIS, to the extent this is practicable. Beyond this, Corps staff support will generally be made available to the lead agency to the extent practicable within its own responsibility and available resources. Any assistance to a lead agency beyond this will normally be by written agreement with the lead agency providing for the Corps expenses on a cost reimbursable basis. If the district engineer believes a public hearing should be held and another agency is lead agency, the district engineer should request such a hearing and provide his reasoning for the request. The district engineer should suggest a joint hearing and offer to take an active part in the hearing and ensure coverage of the Corps concerns.

d. *Scope of Analysis.* See paragraph 7b.

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of September 16, 2019

Title 40 → Chapter I → Subchapter H → Part 230 → Subpart B → §230.10

Title 40: Protection of Environment
PART 230—SECTION 404(b)(1) GUIDELINES FOR SPECIFICATION OF DISPOSAL SITES FOR DREDGED OR FILL MATERIAL
Subpart B—Compliance With the Guidelines

___

### §230.10  Restrictions on discharge.

NOTE: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in §230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (*i.e.*, is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species lis **AP-14** angered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the

Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

Need assistance?

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of September 16, 2019

Title 40 → Chapter V → Part 1501

Title 40: Protection of Environment

---

**PART 1501—NEPA AND AGENCY PLANNING**

---

## Contents

§1501.1  Purpose.
§1501.2  Apply NEPA early in the process.
§1501.3  When to prepare an environmental assessment.
§1501.4  Whether to prepare an environmental impact statement.
§1501.5  Lead agencies.
§1501.6  Cooperating agencies.
§1501.7  Scoping.
§1501.8  Time limits.

---

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

↱ Back to Top

### §1501.1  Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

↱ Back to Top

### §1501.2  Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by §1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by pr**AP-16** ants or other non-Federal entities before Fede involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

↟ Back to Top

### §1501.3  When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in §1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

↟ Back to Top

### §1501.4  Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in §1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by §1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in §1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under §1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3, or

(ii) The nature of the proposed action is one without precedent.

↟ Back to Top

### §1501.5  Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.



(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

↥ Back to Top

## §1501.6  Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in §1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major ac........ ..

analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

↥ Back to Top

### §1501.7  Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§1508.22) in the FEDERAL REGISTER except as provided in §1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under §1507.3(c). An agency may give notice in accordance with §1506.6.

(2) Determine the scope (§1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in §1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§1502.7).

(2) Set time limits (§1501.8).

(3) Adopt procedures under §1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

↥ Back to Top

### §1501.8  Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by §1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for ~~...~~ ed action requests them: *Provided,* That the lim consistent with the purposes of NEPA and other essential ~~...~~ ns of national policy.



# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of September 16, 2019

Title 40 → Chapter V → Part 1506

Title 40: Protection of Environment

## PART 1506—OTHER REQUIREMENTS OF NEPA

**Contents**

§1506.1  Limitations on actions during NEPA process.
§1506.2  Elimination of duplication with State and local procedures.
§1506.3  Adoption.
§1506.4  Combining documents.
§1506.5  Agency responsibility.
§1506.6  Public involvement.
§1506.7  Further guidance.
§1506.8  Proposals for legislation.
§1506.9  Filing requirements.
§1506.10  Timing of agency action.
§1506.11  Emergencies.
§1506.12  Effective date.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

⤴ Back to Top

### §1506.1  Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in §1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

⤴ Back to Top

### §1506.2  Elimination of duplication with State and local AP-20 es.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

⤴ Back to Top

### §1506.3  Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

⤴ Back to Top

### §1506.4  Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

⤴ Back to Top

### §1506.5  Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this **AP-21** all make its own evaluation of the environmental and take responsibility for the scope and content of the environmental assessment.



(c) *Environmental impact statements.* Except as provided in §§1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under §1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

↑ Back to Top

§1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for inter memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the

AP-22

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of September 16, 2019

Title 40 → Chapter V → Part 1508

Title 40: Protection of Environment

## PART 1508—TERMINOLOGY AND INDEX

### Contents

§1508.1   Terminology.
§1508.2   Act.
§1508.3   Affecting.
§1508.4   Categorical exclusion.
§1508.5   Cooperating agency.
§1508.6   Council.
§1508.7   Cumulative impact.
§1508.8   Effects.
§1508.9   Environmental assessment.
§1508.10   Environmental document.
§1508.11   Environmental impact statement.
§1508.12   Federal agency.
§1508.13   Finding of no significant impact.
§1508.14   Human environment.
§1508.15   Jurisdiction by law.
§1508.16   Lead agency.
§1508.17   Legislation.
§1508.18   Major Federal action.
§1508.19   Matter.
§1508.20   Mitigation.
§1508.21   NEPA process.
§1508.22   Notice of intent.
§1508.23   Proposal.
§1508.24   Referring agency.
§1508.25   Scope.
§1508.26   Special expertise.
§1508.27   Significantly.
§1508.28   Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

↥ Back to Top

## §1508.1   Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

↥ Back to Top

## §1508.2   Act.

*Act* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

↥ Back to Top

## §1508.3   Affecting.

*Affecting* means will or may have an effect on.

 **AP-23**



↑ Back to Top

### §1508.4 Categorical exclusion.

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

↑ Back to Top

### §1508.5 Cooperating agency.

*Cooperating agency* means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

↑ Back to Top

### §1508.6 Council.

*Council* means the Council on Environmental Quality established by title II of the Act.

↑ Back to Top

### §1508.7 Cumulative impact.

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

↑ Back to Top

### §1508.8 Effects.

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

↑ Back to Top

### §1508.9 Environmental assessment.

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is nAP-24

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 230

[WH-FRL 1647-7]

### Guidelines for Specification of Disposal Sites for Dredged or Fill Material

**AGENCY:** Environmental Protection Agency.

**ACTION:** Rule.

**SUMMARY:** The 404(b)(1) Guidelines are the substantive criteria used in evaluating discharges of dredged or fill material under section 404 of the Clean Water Act. These Guidelines revise and clarify the September 5, 1975 Interim final Guidelines regarding discharge of dredged or fill material into waters of the United States in order to:

(1) Reflect the 1977 Amendments of Section 404 of the Clean Water Act (CWA);

(2) Correct inadequacies in the interim final Guidelines by filling gaps in explanations of unacceptable adverse impacts on aquatic ecosystems and by requiring documentation of compliance with the Guidelines; and

(3) Produce a final rulemaking document.

**EFFECTIVE DATE:** These Guidelines will apply to all 404 permit decisions made after March 23, 1981. In the case of civil works projects of the United States Army Corps of Engineers involving the discharge of dredged or fill material for which there is no permit application or permit as such, these Guidelines will apply to all projects on which construction or dredging contracts are issued, or on which dredging is initiated for Corps operations not performed under contract, after October 1, 1981. In the case of Federal construction projects meeting the criteria in section 404(r), these Guidelines will apply to all projects for which a final environmental impact statement is filed with EPA after April 1, 1981.

**FOR FURTHER INFORMATION CONTACT:** Joseph Krivak, Director, Criteria and Standards Division (WH-585), Environmental Protection Agency, 401 M Street, S.W., Washington, D.C. 20460, telephone (202) 755-0100.

**SUPPLEMENTARY INFORMATION:**

### Background

The section 404 program for the evaluation of permits for the discharge of dredged or fill material was originally enacted as part of the Federal Water Pollution Control Amendments of 1972. The section authorized the Secretary of the Army acting through the Chief of Engineers to issue permits specifying disposal sites in accordance with the section 404(b)(1) Guidelines. Section 404(b)(2) allowed the Secretary to issue permits otherwise prohibited by the Guidelines, based on consideration of the economics of anchorage and navigation. Section 404(c) authorized the Administrator of the Environmental Protection Agency to prohibit or withdraw the specification of a site, upon a determination that use of the site would have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

Under section 404(b)(1), the Guidelines are to be based on criteria comparable to those in section 403(c) of the Act, for the territorial seas, contiguous zone, and oceans. Unlike 403(c), 404 applies to all waters of the United States. Characteristics of waters of the United States vary greatly, both from region to region and within a region. There is a wide range of size, flow, substrate, water quality, and use. In addition, the materials to be discharged, the methods of discharge, and the activities associated with the discharge also vary widely. These and other variations make it unrealistic at this time to arrive at numerical criteria or standards for toxic or hazardous substances to be applied on a nationwide basis. The susceptibility of the aquatic ecosystem to degradation by purely physical placement of dredged or fill material further complicates the problem of arriving at nationwide standards. As a result, the Guidelines concentrate on specifying the tools to be used in evaluating and testing the impact of dredged or fill material discharges on waters of the United States rather than on simply listing numerical pass-fail points.

The first section 404(b)(1) Guidelines were promulgated by the Administrator in interim final form on September 5, 1975, after consultation with the Corps of Engineers. Since promulgation of the interim final Guidelines, the Act has been substantially amended. The Clean Water Act of 1977 established a procedure for transferring certain permitting authorities to the states, exempted certain discharges from any section 404 permit requirements, and gave the Corps enforcement authority. These amendments also increased the importance of the section 404(b)(1) Guidelines, since some of the exemptions are based on alternative ways of applying the Guidelines. These changes, plus the experience of EPA and the Corps in working with the interim final Guidelines, have prompted a revision of the Guidelines. The proposed revision attempted to reorganize the Guidelines, to make it clearer what had to be considered in evaluating a discharge and what weight should be given to such considerations. The proposed revision also tightened up the requirements for the permitting authority's documentation of the application of the Guidelines.

After extensive consultation with the Corps, the proposed revisions were put out for public comment (44 FR 54222, September 18, 1979). EPA has reviewed, and, after additional consultation with the Corps, revised the proposal in light of these comments. This preamble addresses the significant comments received, explains the changes made in the regulation, and attempts to clear up some misunderstandings which were revealed by the comments. Response to Significant Comments

### Regulation Versus Guideline

A number of commenters objected to the proposed Guidelines on the grounds that they were too "regulatory." These commenters argued that the term "guidelines" which appears in section 404(b)(1) requires a document with less binding effect than a regulation. EPA disagrees. The Clean Water Act does not use the word "guideline" to distinguish advisory information from regulatory requirements. Section 404(b)(2) clearly demonstrates that discharges could be "prohibited" by the Guidelines. Section 403 (which is a model for the 404 (b)(1) Guidelines) also provides for "guidelines" which are clearly regulatory in nature. Consequently, we have not changed the regulation to make it simply advisory. Of course, as the regulation itself makes clear, a certain amount of flexibility is still intended. For example, while the ultimate conditions of compliance are "regulatory", the Guidelines allow some room for judgment in determining what must be done to arrive at a conclusion that those conditions have or have not been met. See, for example, § 230.6 and § 230.00, and introductory sentence in § 230.10.

### Statutory Scheme and How the Guidelines Fit Into It

A number of commenters with objections appeared confused about EPA's role in the section 404 program. Some wondered why EPA was issuing Guidelines since EPA could stop an unacceptable discharge under section 404(c). Others were uncertain how the

Guidelines related to other section 404 regulations.

The Clean Water Act prohibits the discharge of dredged or fill material except in compliance with section 404. Section 404 sets up a procedure for issuing permits specifying discharge sites. Certain discharges (e.g. emergency repairs, certain farm and forest roads, and other discharges identified in sections 404(f) and (r)) are exempted from the permit requirements. The permitting authority (either the Corps of Engineers or an approved State program) approves discharges at particular sites through application of the section 404(b)(1) Guidelines, which are the substantive criteria for dredged and fill material discharges under the Clean Water Act. The Corps also conducts a Public Interest Review, which ensures that the discharge will comply with the applicable requirements of other statutes and be in the public interest. The Corps or the State, as the case may be, must provide an opportunity for a public hearing before making its decision whether to approve or deny. If the Corps concludes that the discharge does not comply with the Guidelines, it may still issue the permit under 404(b)(2) if it concludes that the economics of navigation and anchorage warrant. Section 404(b)(2) gives the Secretary a limited authority to issue permits prohibited by the Guidelines; it does not, as some commenters suggested, require the Guidelines to consider the economics of navigation and anchorage. Conversely, because of 404(b)(2), the fact that a discharge of dredged material does not comply with the Guidelines does *not* mean that it can never be permitted. The Act recognizes the concerns of ports in section 404(b)(2), not 404(b)(1). Many readers apparently misunderstood this point.

EPA's role under section 404 is several-fold. First, EPA has the responsibility for developing the 404(b)(1) Guidelines in conjunction with the Corps. Second, EPA reviews permit applications and gives its comments (if any) to the permitting authority. The Corps may issue a permit even if EPA comments adversely, after consultation takes place. In the case of state programs, the State director may not issue a permit over EPA's unresolved objection. Third, EPA has the responsibility for approving and overseeing State 404 programs. In addition, EPA has enforcement responsibilities under section 309. Finally, under either the Federal or State program, the Administrator may also prohibit the specification of a discharge

site, or restrict its use, by following the procedures set out in section 404(c), if he determines that discharge would have an unacceptable adverse effect on fish and shellfish areas (including spawning and breeding areas), municipal water supplies, wildlife, or recreation areas. He may do so in advance of a planned discharge or while a permit application is being evaluated or even, in unusual circumstances, after issuance of a permit. (See preamble to 40 CFR Part 231, 44 FR 58076, October 9, 1979.) If the Administrator uses 404(c), he may block the issuance of a permit by the Corps or a State 404 program. Where the Administrator has exercised his section 404(c) authority to prohibit, withhold, or restrict the specification of a site for disposal, his action may not be overridden under section 404(b)(2). The fact that EPA has 404(c) authority does not lessen EPA's responsibility for developing the 404(b)(1) Guidelines for use by the permitting authority. Indeed, if the Guidelines are properly applied, EPA will rarely have to use its 404(c) veto.

The Clean Water Act provides for several uses of the Guidelines in addition to the individual permit application review process described above. For example, the Corps or an approved state may issue General permits for a category of similar activities where it determines, on the basis of the 404(b)(1) Guidelines, that the activities will cause only minimal adverse environmental effects both individually and cumulatively (Section 404(e) and (g)(1)). In addition, some of the exemptions from the permit requirements involve application of the Guidelines. Section 404(r) exempts discharges associated with Federal construction projects where, among other things, there is an Environmental Impact Statement which considers the 404(b)(1) Guidelines. Section 404(f)(1)(F) exempts discharges covered by best management practices (BMP's) approved under section 208(b)(4)(B) and (c), the approval of which is based in part on consistency with the 404(b)(1) Guidelines.

Several commenters asked for a statement on the applicability of the Guidelines to enforcement procedures. Under sections 309, 404(h)(1)(G), and 404(s), EPA, approved States, and the Corps all play a role in enforcing the section 404 permit requirements. Enforcement actions are appropriate when someone is discharging dredged or fill material without a required permit, or violates the terms and conditions of a permit. The Guidelines as such are generally irrelevant to a determination

of either kind of violation, although they may represent the basis for particular permit conditions which are violated. Under the Corps' procedural regulations, the Corps may accept an application for an after-the-fact permit, in lieu of immediately commencing an enforcement action. Such after-the-fact permits may be issued only if they comply with the 404(b)(1) Guidelines as well as other requirements set out in the Corps' regulations. Criteria and procedures for exercising the various enforcement options are outside the scope of the section 404(b)(1) Guidelines.

Some commenters suggested that we either include specific permit processing procedures or that we cross-reference regulations containing them. Such procedures are described in 33 CFR Part 320–327 (Corps' procedures) and in 40 CFR Part 122–124 (minimum State procedures). When specific State 404 programs are approved, their regulations should also be consulted.

## How Future Changes in the Testing Provision Relate to Promulgation of This Final Rule

The September 18, 1979, proposal contained testing provisions which were essentially the same as those in the Interim Final regulations. The Preamble to that proposal explained that it was our intention to propose changes in the testing provisions, but that a proposal was not yet ready. Consequently, while we have been revising the rest of the Guidelines, we have also been working on a proposal for reorganizing and updating the testing provisions. Now that we have finalized the rest of the Guidelines, two options are available to us. First, we could delay issuing any final revisions to our 1979 proposal until we could propose a revised testing package, consider comments on it, and finalize the testing provisions. We could then put together the Guidelines and the revised testing section in one final regulation. The 1975 interim final Guidelines would remain in their entirety until then. Second, we could publish the final Guidelines (with the 1975 testing provisions) and simultaneously propose changes to the testing provision. It is our present belief that proposed changes to the testing provision would not affect the rest of the Guidelines, but the public would be allowed to comment on any inconsistencies it saw between the rest of the Guidelines and the testing proposal. Then, when the comments to the testing proposal had been considered, we would issue a new final regulation incorporating both the previously promulgated final Guidelines and the final revised testing provision.

We have selected the second option because this approach ensures that needed improvements to the Guidelines are made effective at the earliest possible date, it gives the public ample opportunity to comment on the revised testing section, and it maintains the 1975 testing requirements in effect during the interim which would be the case in any event.

## Guideline Organization

Many readers objected to the length and complexity of the Guidelines. We have substantially reorganized the regulation to eliminate duplicative material and to provide a more logical sequence. These changes should make it easier for applicants to understand the criteria and for State and Corps permit evaluators and the Administrator to apply the criteria. Throughout the document, we have also made numerous minor language changes to improve the clarity of the regulations, often at the suggestion of commenters.

Following general introductory material and the actual compliance requirements, the regulations are now organized to more closely follow the steps the permitting authority will take in arriving at his ultimate decision on compliance with the Guidelines.

By reorganizing the Guidelines in this fashion, we were also able to identify and eliminate duplicative material. For example, the proposed Guidelines listed ways to minimize impacts in many separate sections. Since there was substantial overlap in the specific methods suggested in those sections, we consolidated them into new Subpart H. Other individual sections have been made more concise. In addition, we have decreased the number of *comments*, moving them to the Preamble or making them part of the Regulation, as appropriate.

## General Permits

When issued after proper consideration of the Guidelines, General permits are a useful tool in protecting the environment with a minimum of red tape and delay. We expect that their use will expand in the future.

Some commenters were confused about how General permits work. A General permit will be issued only after the permitting authority has applied the Guidelines to the class of discharges to be covered by the permit. Therefore, there is no need to repeat the process at the time a particular discharge covered by the permit takes place. Of course, under both the Corps' regulations and EPA's regulations for State programs, the permitting authority may suspend General permits or require individual

permits where environmental concerns make it appropriate. For example, cumulative impacts may turn out to be more serious than predicted. This regulation is not intended to establish the *procedures* for issuance of General permits. That is the responsibility of the permitting authority in accordance with the requirements of section 404.

## Burden of Proof

A number of commenters objected to the presumption in the regulations in general, and in proposed § 230.1(c) in particular, that dredged or fill material should not be discharged unless it is demonstrated that the planned discharge meets the Guidelines. These commenters thought that it was unfair and inconsistent with section 404(c) of the Act.

We disagree with these objections, and have retained the presumption against discharge and the existing burden of proof. However, the section has been rewritten for clarity.

The Clean Water Act itself declares a national goal to be the elimination of the discharge of pollutants into the navigable waters (section 101(a)(1)). This goal is implemented by section 301, which states that such discharges are unlawful except in compliance with, *inter alia*, section 404. Section 404 in turn authorizes the permitting authority to allow discharges of dredged or fill material if they comply with the 404(b)(1) Guidelines. The statutory scheme makes it clear that discharges shall not take place until they have been found acceptable. Of course, this finding may be made through the General permit process and the statutory exemptions as well as through individual permits.

The commenters who argued that section 404(c) shifts the usual burden to the EPA Administrator misunderstood the relationship between section 404(c) and the permitting process. The Administrator's authority to prohibit or restrict a site under section 404(c) operates independently of the Secretary of the Army's permitting authority in 404(a). The Administrator may use 404(c) whether or not a permit application is pending. Conversely, the Secretary may deny a permit on the basis of the Guidelines, whether or not EPA initiates a 404(c) proceeding. If the Administrator uses his 404(c) "veto," then he does have the burden to justify his action, but that burden does not come into play until he begins a 404(c) proceeding (See 40 CFR Part 231).

## Toxic Pollutants

Many commenters objected strenuously to the presumptions in the

Guidelines that toxic pollutants on the section 307(a)(1) list are present in the aquatic environment unless demonstrated not to be, and that such pollutants are biologically available unless demonstrated otherwise. These commenters argued that rebutting these presumptions could involve individual testing for dozens of substances every time a discharge is proposed, imposing an onerous task.

The proposed regulation attempted to avoid unnecessary testing by providing that when the § 230.22(b) "reason to believe" process indicated that toxics were not present in the discharge material, no testing was required. On the other hand, contaminants other than toxics required testing if that same "reason to believe" process indicated they might be present in the discharge material. This is in fact a distinction without a difference. In practical application, toxic and non-toxic contaminants are treated the same; if either may be there, tests are performed to get the information for the determinations; if it is believed they are not present, no testing is done. Because the additional presumption for toxics did not actually serve a purpose, and because it was a possible source of confusion, we have eliminated it, and now treat "toxics" and other contaminants alike, under the "reason to believe test" (§ 230.60). We have provided in § 230.3 a definition of "contaminants" which encompasses the 307(a)(1) toxics.

## Water Dependency

One of the provisions in the proposed Guidelines which received the most objections was the so-called "water dependency test" in the proposed § 230.10(e). This provision imposed an additional requirement on fills in wetlands associated with non-water dependent activities, namely a showing that the activity was "necessary." Many environmentalists objected to what they saw as a substantial weakening of the 1975 version of the water dependency test. Industry and development-oriented groups, on the other hand, objected to the "necessary" requirement because it was too subjective, and to the provision as a whole to the extent that it seemed designed to block discharges in wetlands automatically.

We have reviewed the water dependency test, its original purpose, and its relationship to the rest of the Guidelines in light of these comments. The original purpose, which many commenters commended, was to recognize the special values of wetlands and to avoid their unnecessary destruction, particularly when

practicable alternatives were available in non-aquatic areas to achieve the basic purposes of the proposal. We still support this goal, but we have changed the water-dependency test to better achieve it.

First, we agree with the comments from both sides that the "necessary" test imposed by the 1979 proposal is not likely to be workable in practice, and may spawn more disputes than it settles. However, if the "necessary" test is simply deleted, section 230.10(e) does not provide any special recognition of or protection for wetlands, and thus defeats its purpose. Furthermore, even if the "necessary" test were retained, the provision applies only to discharges of fill material, not discharges of dredged material, a distinction which lessens the effectiveness of the provision. Thus, we have decided, in accordance with the comments, that the proposal is unsatisfactory.

We have therefore decided to focus on, round out, and strengthen the approach of the so-called "water dependency" provision of the 1975 regulation. We have rejected the suggestion that we simply go back to the 1975 language, in part because it would not mesh easily with the revised general provisions of the Guidelines. Instead, our revised "water dependency" provision creates a presumption that there are practicable alternatives to non-water dependent" discharges proposed for special aquatic sites. "Non-water dependent" discharges are those associated with activities which do not require access or proximity to or siting within the special aquatic site to fulfill their basic purpose. An example is a fill to create a restaurant site, since restaurants do not need to be in wetlands to fulfill their basic purpose of feeding people. In the case of such activities, it is reasonable to assume there will generally be a practicable site available upland or in a less vulnerable part of the aquatic ecosystem. The mere fact that an alternative may cost somewhat more does not necessarily mean it is not practicable (see § 230.10(a)(2) and discussion below). Because the applicant may rebut the presumption through a clear showing in a given case, no unreasonable hardship should be worked. At the same time, this presumption should have the effect of forcing a hard look at the feasibility of using environmentally preferable sites. This presumption responds to the overwhelming number of commenters who urged us to retain a water dependency test to discourage avoidable discharges in wetlands.

In addition, the 1975 provision effectively created a special, irrebuttable presumption that alternatives to wetlands were always less damaging to the aquatic ecosystem. Because our experience and the comments indicate that this is not always the case, and because there could be substantial impacts on other elements of the environment and only minor impacts on wetlands, we have chosen instead to impose an explicit, but rebuttable, presumption that alternatives to discharges in special aquatic sites are less damaging to the aquatic ecosystem and are environmentally preferable. Of course, the general requirement that impacts on the aquatic ecosystem not be unacceptable also applies. The legislative history of the Clean Water Act, Executive Order 11990, and a large body of scientific information support this presumption.

Apart from the fact that it may be rebutted, this second presumption reincorporates the key elements of the 1975 provision. Moreover, it strengthens it because the recognition of the special environmental role of wetlands now applies to all discharges in special aquatic sites, whether of dredged or fill material, and whether or not water dependent. At the same time, this presumption, like the first one described above, retains sufficient flexibility to reflect the circumstances of unusual cases.

Consistent with the general burden of proof under these Guidelines, where an applicant proposes to discharge in a special aquatic site it is his responsibility to persuade the permitting authority that both of these presumptions have clearly been rebutted in order to pass the alternatives portion of these Guidelines.

Therefore, we believe that the new § 230.10(a)(3), which replaces proposed 230.10(e), will give special protection to wetlands and other special aquatic sites regardless of material discharged, allay industry's concerns about the "necessary" test, recognize the possibility of impacts on air and upland systems, and acknowledge the variability among aquatic sites and discharge activities.

### Alternatives

Some commenters objected at length to the scope of alternatives which the Guidelines require to be considered, and to the requirement that a permit be denied unless the least harmful such alternative were selected. Others wrote to urge us to retain these requirements. In our judgment, a number of the objections were based on a

misunderstanding of what the proposed alternatives analysis required. Therefore, we have decided to clarify the regulation, but have not changed its basic thrust.

Section 403(c) clearly requires that alternatives be considered, and provides the basic legal basis for our requirement. While the statutory provision leaves the Agency some discretion to decide *how* alternatives are to be considered, we believe that the policies and goals of the Act, as well as the other authorities cited in the Preamble to the proposed Guidelines, would be best served by the approach we have taken.

First, we emphasize that the only alternatives which must be considered are *practicable* alternatives. What is practicable depends on cost, technical, and logistic factors. We have changed the word "economic" to "cost". Our intent is to consider those alternatives which are reasonable in terms of the overall scope/cost of the proposed project. The term economic might be construed to include consideration of the applicant's financial standing, or investment, or market share, a cumbersome inquiry which is not necessarily material to the objectives of the Guidelines. We consider it implicit that, to be practicable, an alternative must be capable of achieving the basic purpose of the proposed activity. Nonetheless, we have made this explicit to allay widespread concern. Both "internal" and "external" alternatives, as described in the September 18, 1979 Preamble, must satisfy the practicable test. In order for an "external" alternative to be practicable, it must be reasonably available or obtainable. However, the mere fact of ownership or lack thereof, does not necessarily determine reasonable availability. Some readers were apparently confused by the Preamble to the Proposed Regulation, which referred to the fact the National Environmental Policy Act (NEPA) may require consideration of courses of action beyond the authority of the agency involved. We did not mean to suggest that the Guidelines were necessarily imposing such a requirement on private individuals but, rather, to suggest that what we were requiring was well within the alternatives analyses required by NEPA.

Second, once these practicable alternatives have been identified in this fashion, the permitting authority should consider whether any of them, including land disposal options, are less environmentally harmful than the proposed discharge project. Of course, where there is no significant or easily identifiable difference in impact, the