IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRIENDS OF THE CAPITAL
CRESCENT TRAIL, *et al.*,                     *

    Plaintiffs                                *

    v.                                        *          CIVIL NO.  JKB-19-106

UNITED STATES ARMY CORPS                      *
OF ENGINEERS, *et al.*,
                             *

    Defendants                                *

MARYLAND DEPARTMENT OF                        *
TRANSPORTATION, *et al.*,

    Defendant-Intervenors                     *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

This lawsuit represents the Friends of the Capital Crescent Trail's third attempt to prevent the construction of the light rail transit project known as the "Purple Line."  In this case, Plaintiffs challenge the decision of Defendants, the United States Army Corps of Engineers ("the Corps"), Col. John Litz, and Chief Joseph DaVia, to grant the Clean Water Act permit authorizing Defendant-Intervenors Maryland Department of Transportation ("MDOT") and Maryland Transit Administration (collectively "MTA" or "Maryland") to discharge dredge and fill materials in connection with the development of the Purple Line.  Plaintiffs contend that Defendants' issuance of the permit was contrary to the requirements of the Clean Water Act and violated the Administrative Procedure Act.  They seek declaratory relief and an order of vacatur.

All parties have moved for summary judgment and the cross-motions are fully briefed.  Plaintiffs also moved for an order rescheduling a hearing on the cross-motions.  No hearing is

required and Plaintiffs' request is accordingly denied.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons set forth below, Plaintiffs' motion for summary judgment will be denied, and Defendants' and Defendant-Intervenors' cross-motions for summary judgment will be granted.

### I.      *The Parties and the Regulatory Framework*

The Friends of the Capital Crescent Trail ("FCCT") is a 501(c)(3) non-profit organization dedicated to preserving parkland, open space, and quality of life in Montgomery County, Maryland.  (Compl. ¶ 4, ECF No. 1.)  Plaintiff John Fitzgerald is a semi-retired public interest attorney and consultant who lived in Chevy Chase, Maryland until recently, and who remains a lover and regular visitor of the area's parks, including the Georgetown Branch of the Capital Crescent Trail ("the Trail").  (*Id.* ¶ 6; Fitzgerald Decl. ¶ 2, ECF No. 34-3.)  Plaintiff Leonard Scensny is a resident of Chevy Chase and an avid user of the area's parks, including the Trail. (Compl. ¶ 7.)

MTA is a unit of MDOT, which is an agency of the State of Maryland.  (Mot. Intervene Mem. Supp. at 2, ECF No. 20-2.)   MTA is generally responsible for the development, administration, and operation of transit services throughout Maryland.  (*Id.*)  One of MTA's major ongoing projects is the development of the "Purple Line," a 16.2-mile light rail transit project designed to "provide faster, direct, reliable east-west transit service connecting major activity centers" in the Maryland suburbs of Washington, D.C.  (Decision Document at Joint Appendix ("JA") 14, ECF No. 37.)  Pertinent to this litigation, the Purple Line will permanently alter the Trail, compromising the "natural, quiet conditions" that members of the FCCT cherish.  (Roy Decl. ¶ 4, ECF No. 34-2.)  Also pertinent, the development of the Purple Line project entails the discharge of dredge and fill materials into certain nearby waters, which can only be done if authorized by the Corps—a federal agency with regulatory and permitting jurisdiction under the

Clean Water Act ("CWA" or the "Act").  (Corps Ans. ¶ 12, ECF No. 18.)  Defendants Colonel Litz and Chief DaVia are Corps officials with authority over the issuance of permits in Maryland. (Compl. ¶¶ 13-14.)

Though the CWA generally prohibits the discharge of dredge and fill materials into navigable waters, Section 404 (33 U.S.C. § 1344) provides that the Corps may issue permits authorizing such discharge in accordance with the Section 404(b)(1) Guidelines, as codified at 40 C.F.R. § 230 (the "Guidelines").  The Guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).  This rule is known as the "least environmentally damaging practicable alternative" ("LEDPA") requirement.  The Guidelines further establish that to be a "practicable alternative," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

If a non-water dependent project involves discharging dredge and fill materials into a "special aquatic site" like a wetland, then the Guidelines establish a presumption that practicable alternatives not impacting special aquatic sites are available, "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).  Accordingly, the Corps may only issue a permit authorizing discharge in a special aquatic site if the Corps determines that the permit applicant has rebutted this presumption.  Proof that the Corps made a reasonable determination on this score "does not require a specific level of detail . . . but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence." *Hillsdale Envt'l Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012).

Additionally, "[t]he plain language of the Section 404 regulatory scheme indicates that the level of review depends on the nature and severity of the project's impact on the [aquatic] environment." *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1447 (1st Cir. 1992) (citing 40 C.F.R. § 230.10 ("the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities")).

Separate from the CWA, the National Environmental Policy Act ("NEPA") also requires federal agencies to take a "hard look" at all potential environmental impacts before taking "major Federal actions significantly affecting the quality of the human environment." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005) (quoting 42 U.S.C. § 4332(2)(C)). To satisfy NEPA, "an agency must prepare a 'detailed statement . . . [on] the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action.'" *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 868 (D.C. Cir. 1999) (quoting 42 U.S.C. § 4332(2)(C)(i)–(iii)) (alterations in original). This is known as the "environmental impact statement" ("EIS"). The CWA Section 404(b)(1) Guidelines contemplate the possibility that a particular project for which a Section 404 permit is required may also be subject to NEPA. In such instances, 40 C.F.R. § 230.10(a)(4) establishes:

> the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

4

## II.     Factual and Procedural Background

The Purple Line represents the culmination of decades of planning, and the project has been subject to many years of detailed analysis regarding its environmental impact.  (MTA Mot. Summ. J. Mem. Supp. at 2–3, ECF No. 38-1.)  The Federal Transit Administration ("FTA") and MTA first began preparing a NEPA EIS related to the Purple Line project in 2003, and the FTA published a notice announcing its intent to do so that year.  (Environmental Impact Statement for Bi-County Transitway Project, 68 Fed. Reg. 52,452 (Sept. 3, 2003) at JA767–69.)  In subsequent years, FTA and MTA "examined a wide range of modes and alignments" for the eventual project, seeking comment from the public and other agencies.  (Alternatives Analysis/ Draft EIS at JA722.) The alignments considered in this early stage included various heavy rail, monorail, light rail transit ("LRT"), and bus rapid transit ("BRT") options.  (*Id.* at JA722–24.  Though the Corps was not a "cooperating agency," it weighed in at various points during the NEPA process, including to convince FTA and MTA to "eliminat[e] from further consideration" an alignment with particularly severe wetland impacts.  (*Id.* at JA724; Decision Document at JA16.)

After years of evaluating and narrowing down the pool of potential options, FTA and MTA eventually focused in on eight alternative alignments for detailed analysis in 2008.  (Alternatives Analysis/ Draft EIS at JA727–48.)  These included: a baseline "No Build" alternative, which would leave the existing transit system intact; a Transportation System Management ("TSM") alternative, which would improve public transportation services on already existing roads; three BRT alternatives (low, medium, and high investment) that involved constructing a new busway partially separate from automobile traffic and partially sharing existing traffic lanes; and three LRT alternatives (low, medium, and high investment) that likewise involved constructing a new light rail transit line partially separate from automobile traffic and partially sharing existing traffic lanes.

(*Id.*)  Each of the six BRT and LRT alternatives followed similar routes, used a mix of shared-use lanes, dedicated surface lanes, and exclusive guideways, and had similar projected environmental footprints.  (*Id.*; Alternatives Report at JA805-45.)  Though LRT and BRT options that followed different routes were considered earlier in the alternatives evaluation process, they had all been rejected for reasons including poor travel times, property impacts, environmental impacts, cost, and public opposition.  (Alternatives Analysis/ Draft EIS at JA724–27.)

The agencies released an Alternatives Analysis/Draft EIS ("AA/DEIS") summarizing their process and analyzing in detail each of the eight favored alternative alignments in September of 2008.  (*Id.* at JA683–754.)  Following the close of a 90-day comment period, Maryland identified the medium investment LRT option as the "Locally Preferred Alternative," and in August of 2013, FTA issued a Final EIS ("FEIS") identifying the medium investment LRT as such.  (FEIS at JA485.)  Following additional comments, including negative comments from Plaintiffs arguing against the Locally Preferred Alternative, FTA issued its Record of Decision approving the Locally Preferred Alternative in March of 2014.  (Purple Line Record of Decision at JA376–407.)

FCCT promptly filed suit in August of 2014, challenging the sufficiency of the NEPA analysis.  That litigation ended with the D.C. Circuit ruling in the agencies' favor.  *See Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1063 (D.C. Cir. 2017) (holding that the "alternatives analysis contained in the FEIS was sufficient under NEPA").  FCCT also brought a second lawsuit in September of 2017, principally challenging FTA's compliance with the Federal Transit Act.  FCCT's claims in that litigation were dismissed on standing and timeliness grounds. *See Friends of Capital Crescent Trail v. Fed. Transit Admin.,* Civ. No. RJL-17-1811, 2019 WL 1046889, at *7 (D.D.C. Mar. 5, 2019) (finding plaintiffs lacked standing to proceed under the

Federal Transit Act because "plaintiffs' alleged environmental injuries [were] not within the zone

of interests protected by" the statute).

On August 1, 2016, with the aforementioned litigation ongoing, MTA filed an application

for a Section 404 permit with the Corps.  (Permit Application at JA81.)  The Corps then established

a public comment period between September 13 and December 2, 2016.  (Decision Document at

JA14–15.)  Each Plaintiff in this action and a number of other commentators submitted negative

comments arguing against the Locally Preferred Alternative.  (Pl.'s Opp'n Corps Mot. at 13–16,

ECF No. 43.)  In its comments, the FCCT urged the Corps to consider the TSM and low investment

BRT alternatives as practicable alternatives that would have a lesser environmental impact.

(Comments of FCCT *et al.* at JA212, 227–29.)  Other commentators similarly pressed for the

consideration of these options, as well as unspecified "alternative routes."  (Pl.'s Opp'n Corps

Mot. at 16.)  Following the comment period, the Corps requested that MTA provide additional

information relating to, among other things, the alternatives and LEDPA analysis, and MTA

responded.  (Corps Letter to MTA at JA204–06; MTA Response at JA142–96.)

On March 12, 2018, the Corps issued a Memorandum of Record (the "Decision

Document") assessing MTA's permit application.  The Corps defined the overall project purpose

of the Purple Line as being:

> To provide an expedited east-west mass transit service connecting
> major activity centers in a corridor extending from Bethesda to New
> Carrollton; to provide improved connections and travel times to the
> Metrorail services located in the corridor; and to improve
> connectivity to the communities in the corridor located between the
> Metrorail lines.

(Decision Document at JA14.)  The Corps summarized and incorporated by reference the NEPA

alternatives analysis.  (*Id.* at JA17–21.)  The Corps then specifically analyzed the CWA impacts

of nine alternative alignments, including each of the eight considered in the NEPA AA/DEIS, as

well as a "Metrorail Loop" alternative that had been rejected earlier in the NEPA process.  (*Id.*)
The Corps did not specifically analyze the CWA impacts of any other alignments.  (*Id.*)

To start, the Corps rejected the Metrorail Loop alignment as impracticable due to its higher
cost, lower efficacy, and greater environmental impact.  (*Id*. at JA18.)  The Corp then determined
that the No-Build and TSM alternatives were not practicable in light of the overall project purpose,
since the No-Build alternative would not improve capacity or travel times at all, and the TSM
alternative would improve them only slightly.  (*Id.* at JA18–19.)  The Corps then analyzed each of
the six LRT and BRT options, including the Locally Preferred Alternative.  (*Id.* at JA18–22.) This
analysis summarized the factors evaluated in the AA/DEIS, including the speed and transit
capacities of the various alternatives.   The analysis also discussed each alternative's projected
aquatic impacts.  At the end of this analysis, the Corps found that the Locally Preferred Alternative
was the LEDPA, since it was the configuration with the least permanent wetland impacts.  (*Id.* at
JA22–24.)  The Corps included the below summary table supporting this conclusion:

| Build Alternatives | Permanent Nontidal Wetland Impacts | Permanent Waters if [sic] the U.S. Impacts |
|---|---|---|
| BRT 1 | 1.30 acres | 5,501 LF [linear feet] |
| BRT 2 | 1.30 acres | 5,717 LF |
| BRT 3 | 1.18 acres | 3,892 LF |
| LRT 1 | 1.28 acres | 4,222 LF |
| LRT 2   Preferred / LEDPA | 0.49 acres | 5,108 LF |
| LRT 3 | 1.48 acres | 5,660 LF |

(*Id.* at JA22.)  The Corps then discussed the various measures taken to minimize the wetland
impacts of the Purple Line and found that "[i]mpacts to the waters of the U.S. and wetlands have
been avoided and minimized wherever practicable through design solutions, including shifting the
transit way alignment, adjusting construction work areas, and using retaining walls and ballast

curbs to minimize the area of disturbance."  (*Id.* at JA30–44.)  The Corps also concluded that the compensatory mitigation measures to which Maryland had agreed would provide a net benefit to the wetlands.  (*Id.* at JA26.)  On March 14, the Corps granted Permit CENAB-OPR-MN (MTA/PURPLE LINE) 2016-61278-M07 ("the Permit"), authorizing permanent impacts to 0.49 acres of wetlands and 5,108 linear feet of streams in association with the Purple Line project. (Permit at JA53–71.)

Plaintiffs brought this lawsuit against the Corps on January 10, 2019 alleging that the Corps' issuance of the Permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act ("APA") because the Corps had not properly required MTA to clearly demonstrate the unavailability of a practicable alternative with less extensive aquatic impacts than the Locally Preferred Alternative.  (Compl. ¶ 1.)  Plaintiffs seek declaratory judgment that the Permit is invalid, and an order of vacatur.  (*Id.*)  MTA moved to intervene, and the motion was granted.  (ECF Nos. 20, 27.)  Subsequently, Plaintiffs moved for summary judgment. (ECF No. 34.)  The Corps cross-moved for summary judgment (ECF No. 36), as did MTA.  (ECF No. 38.)  With these motions pending, the case was reassigned to the undersigned.

### III.    Standard of Review

A court reviewing a challenge to a final agency action under APA Section 706(2)(A) is tasked with evaluating whether the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  This determination must be made "based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  In evaluating an agency's action, a court must "conduct a 'searching and careful' review to determine whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  Though this review is thorough, it is "highly deferential, with a presumption in favor of finding the agency action valid."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  "Particularly with environmental statutes such as the Clean Water Act [where] the regulatory framework is exceedingly 'complex and requires sophisticated evaluation of complicated data,'" courts must respect agency expertise.  *Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (4th Cir. 2003) (quoting *Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998)).

In APA cases, as in other contexts, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Where multiple parties move for summary judgment, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "Summary judgment is especially appropriate in APA actions, as they do not ordinarily involve fact-finding because 'the focal point

for judicial review [under the APA] should be the administrative record already in existence.'" *SourceAmerica v. United States Dep't of Educ.*, 368 F. Supp. 3d 974, 986 (E.D. Va. 2019) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*)).

### IV.    *Standing*

As a threshold matter, the Court must first determine if Plaintiffs have standing to challenge the Corps' issuance of the Permit, since absent standing, the Court is without authority to adjudicate their claim.  Though it is a close question whether the injuries Plaintiffs seek to remedy are within the CWA's "zone of interests," the Court finds that Plaintiffs have established their standing to proceed.

"To satisfy the standing requirement of the case-or-controversy limitation on judicial authority found in Article III, Section 2 of the Constitution, the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision."  *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230–31 (4th Cir. 2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  To establish standing on summary judgment, a plaintiff must "submit affidavits or other evidence showing, through specific facts," the plaintiff's injury.  *Lujan*, 504 U.S. at 563.  Where a case involves multiple plaintiffs, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006).

In addition to establishing Article III standing, a plaintiff suing for a statutory violation must also demonstrate that the injury it seeks to remedy "fall[s] within the zone of interests protected by the law invoked[.]"  *Lexmark International, Inc. v. Static Control Components, Inc.*,

572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).   "The zone of interests test consists of a two part inquiry: first, determining which interests the statute at issue arguably protects and second, determining whether the agency action affects those interests."  *Pye v. United States*, 269 F.3d 459, 470 (4th Cir. 2001).   Though the zone of interests test must be passed, it "is not meant to be especially demanding," and will foreclose suit "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)).

### a.   Injury in Fact Within the Clean Water Act's Zone of Interests

In order to establish injury in fact, a plaintiff must show that "they suffered an actual or threatened injury that is concrete, particularized, and not conjectural."  *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 400 (4th Cir. 2018).   "The claimed injury need not be great or substantial; an 'identifiable trifle', if actual and genuine, gives rise to standing."  *Conservation Council of North Carolina v. Costanzo,* 505 F.2d 498, 501 (4th Cir. 1974) (quoting *United States v. SCRAP*, 412 U.S. 669, 687–89 n.14 (1973)).   In cases like this one, involving alleged violations of environmental laws, an injury "to an individual's aesthetic or recreational interests" is cognizable.  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000).  However, the party must show an actual and concrete intent to enjoy the environment to be harmed.  *See Lujan*, 504 U.S. at 564.

There can be no doubt that Plaintiffs have established injury in fact here, as in the prior Purple Line litigations.  Plaintiffs testify that they are lovers and regular users of Capital Crescent Trail, and the construction of the Purple Line, as authorized by the Corps' Permit, will undoubtedly

compromise the aesthetic features of the Trail.  The closer question, and the one on which MTA focuses in its briefing, is whether any of Plaintiffs' injuries lie within the CWA's zone of interests.

The primary purpose of the CWA, as declared by Congress and recognized by the Fourth Circuit, is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Gaston Copper*, 204 F.3d at 151 (quoting 33 U.S.C. § 1251(a)).  This is a broad goal, and the CWA's zone of interests has accordingly been held to encompass aesthetic and recreational interests related to water.  *See Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 263 (4th Cir. 2001) (standing to sue under CWA where changes to a stream on plaintiff's property "significantly interfered with her use and enjoyment" of the stream); *White Tanks Concerned Citizens, Inc. v. Strock,* 563 F.3d 1033, 1039 (9th Cir. 2009) (standing to sue under CWA where members of plaintiff organization used affected area for "hiking, horseback riding[,] and other activities.").  However, MTA argues that Plaintiffs' injuries fall outside this broad zone, since Plaintiffs' injuries relate to deforestation and noise-related impacts of the Purple Line project, not "harms associated with discharges to waters of the United States." (MTA Mot. Summ. J. Mem. Supp. at 18.)

While MTA makes a valid point that Plaintiffs' primary injuries clearly relate to the non-aquatic impacts of the Purple Line on the Trail, Plaintiff Fitzgerald, at least, has established an injury in fact within the CWA's zone of interests.  Fitzgerald has testified that, as well as enjoying the general aesthetics of the Trail, he particularly appreciates certain streams and wetlands to be affected by the Purple Line's construction, as authorized by the Permit.  (Fitzgerald Supp. Decl. ¶¶ 12, 16–23, ECF No. 42-3.) Fitzgerald identifies these waters with particularity and testifies that though he has recently moved, he concretely plans to return to the waters described in his declaration on at least an annual basis.  (*Id.* ¶¶ 18–19.)  Though Fitzgerald's injuries within the

CWA's zone of interests may be minor, his declarations establish more than the "identifiable trifle" necessary for standing. *Council of North Carolina,* 505 F.2d at 501.[1]

        **b.** *Traceability and Redressability*

To establish traceability, a plaintiff must show some "causal connection between the injury and the conduct complained of." *Lujan,* 504 U.S. at 560. To establish redressability, the plaintiff must show that "it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." *Long Term Care*, 516 F.3d at 231. Where a plaintiff seeks an order vacating agency action as an antecedent to ultimate relief from the agency, the plaintiff need not show "a likelihood of ultimate relief" from the agency, and instead must merely show a "realistic possibility" that the plaintiff can obtain "ultimate relief" if the litigation is decided in its favor. *State Water Control Bd.*, 898 F.3d at 402.

Fitzgerald's injuries within the CWA's zone of interests are both traceable and redressable. No party disputes that the Corps' issuance of the Permit authorized the aesthetic injuries to the waters Fitzgerald identifies. MTA does dispute redressability, arguing that because the revocation of the Permit could only lead to the restoration of a small amount of wetlands and linear streams and would not lead to the restoration of the Trail, Plaintiffs' "injuries are not redressable." (MTA Reply Mem. Supp. at 5, ECF No. 46.) However, there is no doubt that if this Court vacated the Permit and the Corps subsequently declined to reissue it or altered the terms of the Permit, the aesthetic injury Fitzgerald identified in relation to the waters affected by the Purple Line project could be remedied. Therefore, Fitzgerald's actual injuries within the CWA's zone of interests are both traceable and redressable. As such, Plaintiffs have standing.

---

[1] Because the Court finds that Fitzgerald's declarations establish standing, it need not decide the closer question of whether the declarations of Leonard Scensny and James Roy also establish injuries in the CWA's zone of interests.

*V.      APA Analysis*

Though Plaintiffs have established standing, their challenge fails on the substance, because the evidence does not support their claim that the Corps' decision to issue the Permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Instead, the record shows that the Corps reasonably found that MTA had clearly demonstrated the Locally Preferred Alternative was the LEDPA and that the Corps appropriately permitted the LEDPA.

Plaintiffs do not contest the correctness of the Corps' finding that the Locally Preferred Alternative was the least environmentally damaging practicable alternative among the LRT and BRT alternatives considered in the NEPA process and subsequently presented to the Corps in Maryland's permit application. (Pl.'s Opp'n Corps Mot. at 25.) Plaintiffs also effectively concede that the "No Build" and "TSM" options were insufficient to achieve the overall project purpose. (*Id.*) However, Plaintiffs argue that to consider the 40 C.F.R. § 230.10(a)(3) presumption rebutted, the Corps needed to conduct or demand a more thoroughgoing analysis of the availability of other alternatives not analyzed during the NEPA process, which could potentially have reduced the permanent wetland impacts associated with the Purple Line below the 0.49 acres of the Locally Preferred Alternative. Plaintiffs bolster this argument with the claim that even a cursory review of the record should have made it obvious to the Corps that a never-proposed BRT option which simply avoided widening bridges would have eliminated all the adverse wetland impacts occasioned by the six LRT and BRT options analyzed by the Corps. (Compl. ¶¶ 52-54; Pl.'s Mot. Summ. J. Mem. Supp. at 14, ECF No. 34-1.) Plaintiffs cite the below passage in the AA/DEIS in support of their argument:

> Most of the wetlands identified along the alignments fall outside the
> limits of disturbance for the project. Impacts that do occur are

15

> primarily related to streams that cross perpendicular to the project
> or parallel the roadway and would be affected when existing roads
> are widened to accommodate the transitway. Impacts to streams that
> are currently bridged would be temporary, as these existing
> structures would be extended to accommodate widening. Should
> new culverts be required in streams, the impacts would be expected
> to be more permanent.

(AA/DEIS at Supplemental Appendix ("SA") 979, ECF No. 45-1.)  Plaintiffs claim this passage

proves "that if the existing bridges that cross [] streams are not 'widened to accommodated the

transitway' there will be no adverse environmental impact on the Waters of the United States,"

and that given the clear existence of this alternative, it was unreasonable for the Corps to find that

MTA clearly demonstrated that the Locally Preferred Alternative was the LEDPA.  (Pl.'s Mot.

Summ. J. Mem. Supp. at 14.)

Defendants counter-argue that it was appropriate for the Corps to incorporate the NEPA

alternatives analysis into the Section 404 inquiry and focus on the options that FTA's and MTA's

years of study had identified as potentially feasible, particularly given the very limited aquatic

impact of those options.  Defendants also argue that as a factual matter, Plaintiffs' reading of the

administrative record is wrong, since merely avoiding the widening of existing bridges would not

have altered the permanent wetland impacts of the BRT and LRT alternatives.  (Corps Reply Mem.

Supp. at 8–11, ECF No. 45.)  Further, Defendants argue that Plaintiffs are prudentially barred from

now advocating a new alignment that they failed to raise during the comment period.

Defendants have the better of both the factual and legal arguments.  Starting with the facts,

the administrative record does not support Plaintiffs' assertion that a BRT alternative which merely

avoids bridge widening "jumps out of the Record Memo as a starkly obvious candidate for LEDPA

evaluation [since] the only environmental impact to U.S. Waters arises from widening of []

bridges."  (Pl.'s Opp'n Corps Mot. at 19.)  Preliminarily, Plaintiffs' conclusion that bridge

widening is the cause of all the aquatic impacts associated with the Purple Line does not logically follow from the passage of the AA/DEIS they cite, which instead indicates that impacts associated with bodies of water that are "currently bridged would be temporary" and that more permanent impacts would be the result of other construction.  (AA/DEIS at SA979).  More importantly, in focusing so heavily on a single paragraph in the 2008 draft NEPA analysis, Plaintiffs essentially ignore the much more comprehensive subsequent analyses informing the Corps' decision, including the highly detailed Purple Line Impact Plates (JA266–306) and Impact Table (JA241), which track each individual aquatic impact associated with the Purple Line project.  These analyses reveal no particular connection between bridge widening and wetland impacts.  Instead, they reflect that the Purple Line project's wetland impacts are distributed throughout the Purple Line's 16.2 miles, and are principally associated with "road encroachments and vegetation removal in degraded systems," not bridge construction.  (Decision Document at JA25.)

Furthermore, Plaintiffs have not provided any coherent justification for their position that the Corps should have considered BRT alignments preferable to LRT.  The record does not indicate that BRT is inherently superior to LRT in terms of aquatic impacts, and the rationale Plaintiffs provide—that the BRT "mode of transport, unlike light-rail, is not limited to just one of the three types of guideway, i.e., exclusive guideway" (Pl.'s Opp'n Corps Mot. at 16)—is based on the demonstrably false premise that LRT alignments cannot utilize shared-use and dedicated surface lanes, which is refuted by the record.  (Alternatives Report at JA805-45.)  Last, each of the BRT alternatives analyzed in the AA/DEIS would utilize new bridges, and therefore altering one of these alternatives to avoid bridge construction entirely would not be the minor and intuitive tweak Plaintiffs argue, but rather a substantial and complicated overhaul.  (Alternatives Report at JA813, 817-29.)  In sum, Plaintiffs' proposed BRT without-bridge widening alternative is not at all the

obvious LEDPA Plaintiffs claim, and the Corps cannot be faulted for failing to independently identify it.[2]

This factual dispute having been resolved, there remains the legal issue of the sufficiency of the Corps' alternatives analysis.  The record leaves no doubt that the Corps' alternatives analysis was largely confined to alternatives that were evaluated in the NEPA process.  The Corps essentially accepted FTA's and MTA's rejection of numerous alternatives considered early in the NEPA process, and treated the alignments analyzed at length in the AA/DEIS as the only potentially practicable options.  Thus, the question facing the Court is whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" for the Corps to treat the options that had been judged worthy of detailed study during the NEPA analysis as the only potentially practicable alternatives, rather than conducting or demanding MTA conduct an analysis of the practicability of other unspecified alternatives that FTA and MTA had never considered, and no third party had proposed.  5 U.S.C. § 706(2)(A).

The Court finds that the Corps' analysis was sufficient and in accord with the 404(b)(1) Guidelines.  As Defendants point out, 40 C.F.R. § 230.10(a)(4) establishes that the "analysis of alternatives required for NEPA[], will in most cases provide the information for the evaluation of alternatives under these Guidelines."  40 C.F.R. § 230.10 further establishes that the extent of the Corps' analysis should "vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems."  Likewise, 40 C.F.R. § 230.6 specifies that when it comes to permit applications for projects that "have little, if any, potential for significant degradation of the aquatic

---

[2] Because the Court rejects Plaintiffs' arguments regarding the alleged superiority of this alignment, the Court need not decide whether Plaintiffs waived the right to raise it in this litigation by failing to propose it during the comment period.  *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005) ("[A]s a general matter, a party's presentation of issues during a rulemaking proceeding is not a *jurisdictional* prerequisite to judicial review.") (emphasis in original).

environment [i]t generally is not intended or expected that extensive testing, evaluation or analysis will be needed."

Here, by the time the CWA permitting process began, agencies with more expertise than the Corps in transit matters had already undertaken years of work identifying the best options for the Purple Line project, in a NEPA analysis whose sufficiency has been affirmed by the D.C. Circuit. *See Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051 (D.C. Cir. 2017). Further, while the overall cost, economic impact, and environmental footprint of the Purple Line may all be large, the permanent aquatic impacts to less than half an acre of wetlands and less than a linear mile of streams are quite minor. Given these facts, it was not at all unreasonable for the Corps to incorporate the NEPA alternatives analysis and focus on those alternatives the FTA and MTA had found potentially feasible, rather than trying to "reinvent the wheel" by proposing or demanding novel alternatives that no party has yet clearly outlined. *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013).

Other courts faced with similar challenges to the Corps' reliance on another agency's NEPA alternatives analysis have come to the same conclusion. *See, e.g.*, *id.* ("Although the Corps has an independent responsibility to enforce the Clean Water Act and so cannot just rubberstamp another agency's assurances concerning practicability and environmental harm, it isn't required to reinvent the wheel. If another agency has conducted a responsible analysis the Corps can rely on it in making its own decision."); *Town of Norfolk*, 968 F.2d at 1447–48 (Corps could not "be faulted for relying on [a NEPA] alternatives analysis."); *Alliance For Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 551–52 (M.D.N.C. 2004) ("The Corps's determination that the FAA's alternatives analysis satisfied the Section 404(b)(1) Guidelines was not arbitrary or capricious"). Likewise, in other cases involving more extensive aquatic impacts, courts have

found alternatives analyses that focused on a discrete group of alternatives satisfied the CWA. *See, e.g.*, *Hillsdale*, 702 F.3d at 1168-70 (finding that the Corps' analysis of seven alternatives for a project that would impact 4.61 acres of wetlands constituted a sufficiently "hard look" to satisfy the CWA); *Back Bay Restoration Found., Ltd. v. U.S. Army Corps of Eng'rs*, Civ. No. 19-323, 2020 WL 1068629, at *6 (E.D. Va. Mar. 4, 2020) (upholding issuance of permit authorizing 1.49 acres of wetland impacts where Corps evaluated eight alternatives).[3]  Further, to the extent that Plaintiffs criticize not the breadth of the alternatives considered, but the granularity of the Corps' analysis underlying its conclusion that "[i]mpacts to the waters of the U.S. and wetlands have been avoided and minimized wherever practicable through design solutions," the Guidelines do not require the Corps to provide the microscopic level of analytic detail Plaintiffs demand.  (Decision Document at JA30.)  *C.f. Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1271–72 (10th Cir. 2004) (upholding permit that allowed for the destruction of 1.45 acres of wetlands in spite of deficiency in the evidentiary record, in recognition that the "level of effort and documentation was in accord" with the magnitude of wetland impact).

In sum, the administrative record does not allow the conclusion that the Corps made a "clear error of judgment" in finding that Maryland rebutted the 40 C.F.R. § 230.10(a)(3) presumption.  *Alliance For Legal Action*, 314 F. Supp. 2d at 543.  Plaintiffs have not proposed an obviously superior alternative that the Corps overlooked or shown that the Corps' decisional process was out of proportion with the 0.49 acre wetland impact of the Purple Line project.  Thus,

---

[3] Plaintiffs' citation to *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, is unpersuasive.  606 F. Supp. 2d 121 (D.D.C. 2009).  In that case, which involved a project with impacts to 403 acres of wetlands, the core problem with the Corps' analysis was that it had failed to account for a substantial change in conditions that had occurred in the eight years between the publication of the NEPA EIS and the Corps' issuances of a permit.  Plaintiffs have identified no such changes here, and what is more, the entire wetland impact at issue in this matter amounts to a rounding error in *Mattaponi*.

as a matter of law, the Court finds that the Corps' issuance of the Permit was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

*VI.*    ***Conclusion***

For the foregoing reasons, an order shall enter denying Plaintiffs' motion for summary judgment and granting Defendants' and Defendant-Intervenors' cross-motions for summary judgment.

DATED this 13th day of April, 2020.

BY THE COURT:

_____/s/_____

Chief Judge

21